## Emma Gallagher, Appellee, v. Singer Sewing Machine Company, Appellant.

## Gen. No. 16,509.

1. LIBEL AND SLANDER—*what evidence admissible to prove motive and malice.* In an action for libel against a sewing machine company by a former agent for having inserted in a newspaper an advertisement warning the public from purchasing its machines from her, and stating that she had been discharged for forgery, when the defendant denies having published the same, it is competent for plaintiff to prove the origin of, and circumstances leading to, malice of defendant and a motive for libeling her, as first elements in point of time of substantial proof in establishing the libel, and incidents tending, when considered with all the other evidence, to prove that the libel was published by an agent of defendant; and for such purpose she may show that after leaving defendant's employment she sold defendant's machines on her own account, where she sold them, how she obtained them and what efforts defendant's officers and agents made to hinder or prevent her from selling its machines, and any expressions indicating malice, or repetitions of the libelous matter, made by them in performing their duties and within the scope of their authority, as well as orders not to furnish her with machines, and that she had no other enemies, and also the fact that she had brought suits for damages against defendant and that one of them had been compromised; but she cannot testify as to conversations leading up to such settlement, nor as to the terms thereof, nor as to the merits of such suits.

2. LIBEL AND SLANDER—*when corporation bound by publication by agent.* In an action for libel warning the public from buying the defendant company's machines from plaintiff, where agents of defendant are authorized to hinder and prevent plaintiff from selling its machines, any act done by them in the course of its business and in line of their employment for the purpose of accomplishing such object is binding on the defendant, and where such agent inserts libelous matter in a newspaper to effect such purpose, the company is responsible, notwithstanding it has forbidden its agents in general terms from advertising, and the liability reaches through all the stages of the company's service.

3. LIBEL AND SLANDER—*evidence disproving charge inadmissible where plea not guilty.* In an action for libel accusing plaintiff of having committed forgery, it is not necessary or proper for plaintiff to disprove such charge where the only plea is not guilty.

Gallagher v. Singer Sewing Machine Co., 177 Ill. App. 198.

4. LIBEL AND SLANDER—*evidence of financial condition of defendant admissible.* In an action for libel, evidence of the wealth and financial condition of defendant is admissible.

5. LIBEL AND SLANDER—*evidence of mental anguish of plaintiff admissible.* In an action for libel, evidence of mental anguish and loss of sleep suffered by plaintiff therefrom is admissible.

6. PRINCIPAL AND AGENT—*when principal bound by tortious act of agent.* The act of an agent is "within the course of his employment" when the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose, and general authority to accomplish a given end includes the use of all means reasonably intended and directed to that end, and, as to other parties affected thereby, the principal cannot limit them by express orders to the agents.

7. EVIDENCE—*telephoning a libelous advertisement—when inadmissible.* Where there is no competent evidence tending to prove that defendant authorized, or is responsible for, the telephoning of a libelous advertisement to a newspaper, such libel and its publication are inadmissible in evidence until other evidence has been introduced which tends to show its having been so ordered by defendant.

8. EVIDENCE—*telephone conversations.* It is improper for a court to admit in evidence telephone conversations in which the witness testifying to such conversations cannot identify the speaker as the party he represents himself to be, by his voice, if the speaker is not shown to be talking at his own phone number or that of the person he purports to represent and is not otherwise identified by facts and circumstances as such speaker.

9. EVIDENCE—*telephone conversations.* When a person places himself in connection with the telephone system through an instrument in his office, he thereby invites communication in relation to his business through that channel, and conversations held over such phone in relation to his business carried on there are admissible even where the voice at the phone is not identified.

10. EVIDENCE—*test of admissibility.* Where circumstances are of small or no significance in establishing facts when considered alone, the real question is whether they have any proving force when considered with the other evidence in the case.

11. EVIDENCE—*correspondence.* Where a paragraph of a letter is introduced in evidence, such portions of the letter to which it is a reply as are necessary for an understanding of its full meaning, are admissible.

12. EVIDENCE—*to discredit witness.* Judgments in convictions of infamous offenses are admissible for the purpose of discrediting witnesses, but the evidentiary facts alone leading to such convictions are inadmissible.

13. INSTRUCTIONS—*discrediting witness.* A court cannot legally tell a jury that a contrary statement of a witness out of court to what he testifies in court "tends to discredit him," this being a question for the jury and depending on whether or not the variance is accidental or intentional for corrupt purposes.

14. INSTRUCTIONS—*omitting word "necessarily."* An instruction to a jury commencing, "By a preponderance of proof, the court does not mean a larger number of witnesses on a given point," is misleading because omitting the word "necessarily" before the word "mean."

15. INSTRUCTIONS—*as to damages.* An instruction to a jury on the question of damages should point out the proper and specific elements to be considered in assessing the same.

16. PRACTICE—*unfair arguments by counsel during examination of witnesses.* Where there is substantial doubt as to the influence upon the jury of unfair arguments injected by counsel while examining a witness, or of remarks intended to prejudice or inflame the jury, the party will be deprived of the probable fruits of such unfairness by reversal.

Appeal from the Superior Court of Cook county; the Hon. HOMER ABBOTT, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Reversed and remanded. Opinion filed January 29, 1913. Modified and refiled February 20, 1913.

CARNAHAN, ELSDON & SLUSSER, for appellant.

EDWARD F. DUNNE, HENRY SCHOFIELD and LEE D. MATHIAS, for appellee; CHARLES H. ROBINSON, of counsel.

MR. PRESIDING JUSTICE DUNCAN delivered the opinion of the court.

This action was brought by appellee on June 11, 1907, against appellant for libel. Prior to the first trial appellee dismissed her suit as to The Tribune Company. At the close of the evidence in the first trial appellee took a nonsuit as to M. M. Tatro, and recovered a verdict against appellant, Singer Sewing Machine Company, for $50,000. That verdict was set aside by the trial court. The second trial resulted in a verdict for appellee in the sum of $10,000. At the suggestion of the court, appellee remitted the sum of

$2,500 from the verdict, and the court entered judgment for $7,500, and from this judgment appellant prosecutes this appeal.

The declaration is in one count, charging appellant, a corporation, The Tribune Company and M. M. Tatro with composing and publishing, on the 4th day of June, 1907, of and concerning appellee in a certain newspaper, called the Chicago Daily Tribune, a false, scandalous, defamatory, etc., libel, as follows:

"The public are warned against purchasing our sewing machines from Emma Gallagher, who was discharged from this company for forgery. We will not be responsible for machines bought from her.

SINGER SEWING MACHINE CO.,
M. M. Patro, Agent."

It is contended by appellant that there is an entire absence of any competent testimony in the record tending to show publication of the libel in question by appellant. The evidence is very voluminous and the record thereof contains more than a thousand pages of typewritten matter, and as almost the whole of appellee's evidence was objected to specifically as inadmissible, it will be necessary in the fewest words possible to give the substance of the testimony of her witnesses, which is as follows:

Margaret Murray. That on June 3, 1907, her business was taking "telephone ads" for The Tribune; that on that day she had a telephone conversation with some person who rang her telephone and the advertiser said they wished to give an ad to The Tribune; that she asked the party addressing her, the name, address and telephone number, and that the party answered her, "The Singer Sewing Machine Company, 209 East Jackson boulevard, 4409 Harrison;" that she then asked the party telephoning her if their name appeared in the Telephone Directory, and that she was answered that it did; that she then asked, "What is the advertisement," and that they then dictated to her as the advertisement the words above set forth in the declaration as the libel; and that witness wrote

the words out word for word as dictated to her and that she passed her writing on with the regular ads to The Tribune. She also further stated her duties required her to compare the name, address and telephone number of the party telephoning her with that in the telephone directory to see that it was correct, and that accordingly she compared the telephone address just referred to as given her with the one in the directory, and found it to correspond with that given in the directory; that she did not know who the party was, did not know the voice, but that it sounded like a woman's voice; that there was some controversy over the phone between her and the party talking to her, as to the name "Patro," and that owing to poor connections she could not quite catch the name, and, "I asked her if it was P or T;" that she did not call up the telephone number given her to see if the party telephoning had given their telephone number right, and that the party called her after six o'clock or about six o'clock in the evening.

Admitted that June 3rd and 4th, 1907, appellant had an office at 209 Jackson boulevard, Chicago, and that their telephone number at that office was Harrison 4409; that that was the office of the Manufacturing Trade Department of appellant, and that they sold manufacturing machines only.

Mrs. Maude White. That in May, 1907, Mr. Dorsey of the Singer Sewing Machine Company came to her sister's house in Chicago, Mrs. Hengish, and took away the head of a sewing machine to be repaired; that his assistant brought it back on Saturday thereafter and said that Dorsey told him to ask five dollars for repairing it; that on Monday, Dorsey called and said he would have to have five dollars for repairing it; that she and her sister would not let him in and told him that Miss Gallagher had given them a five-year guaranty from appellant to keep the machine repaired; that after that their telephone would ring and some one would ask if her sister was at home and

would not say who they were, and about five minutes later Mr. Dorsey would call and ask for the money and they would not let him in any time; that on June 4, 1907, she answered the telephone and some one said over phone: "You had better come and pay for repairing your machine. If you will read the morning Tribune, you will see the Singer Sewing Machine Company is not responsible for Emma Gallagher's machines;" that on June 7, 1907, the same voice called up and said to her on the phone: "If you read Tuesday's Tribune you will see that the Singer Sewing Machine Company is not responsible for Miss Gallagher's machines;" that she does not know exactly when Dorsey came to her house, but it was some time between May and June 4th, and that the machine was brought back the latter part of May; that the voice over the phone was a very peculiar voice and her best impression is that it was a man's voice; that she asked who was talking and they would not answer except to continue repeating the same statement about Miss Gallagher; that after getting the telephone messages she looked into The Tribune and found the article about Miss Gallagher published therein.

Mrs. A. E. Bennett.  In July, 1906, Emma Gallagher left a Singer sewing machine at my house.  Mr. Dorsey came to collect for it saying his name was T. F. Dorsey and that he was working for appellant.  I told him I did not buy any sewing machine, that she just left it there on trial, and he said he had then in his hand a contract signed by me.  He told me that Miss Gallagher had been discharged by the Singer Sewing Machine Company for forgery, and that I was not the only one, that she had signed names to different contracts; that she had done so with other ladies; that I was very foolish to allow her to do anything like that, and if I would go to a lawyer and give him five dollars and tell him what Emma Gallagher had done, that she had forged my name to this contract, that would be all he would charge me for his services (for prosecuting her)

and then I could have the machine; that the machine would be mine, that I ought to prosecute her.

Mrs. Etta Turney. Miss Emma Gallagher came to my house in Chicago, May 9, 1907, and took my order for a Singer sewing machine, which was delivered to me a day or two afterwards by a Mr. Spurling. Ten minutes after the delivery of the machine a Singer Sewing Machine Company buggy drove up in which sat Mr. Dorsey and another man, Mr. McCloud, who came up to my house and said: "Mr. Dorsey, Manager of the Wilson avenue store of the Singer Sewing Machine Company, had told him to take the number of the sewing machine that I had just got," and he took the number. (The next day Spurling came up to the house, all excited, and told me he was going to be discharged by the Singer Sewing Machine Company for delivering Singer sewing machines for Miss Gallagher. He worked for the Company.) Mr. Dorsey, Manager of the Wilson avenue store of the Singer Sewing Machine Company, came to my house Tuseday, June 4th, with a newspaper in his outside pocket and tapped it and said: "That fixes Gallagher now; that she won't sell any more machines." And I says, "How is that?" "Well," he says, "That is the Singer Sewing Machine Company's business." I then told him that I did not care to know his affairs; all I wanted was a blue receipt for the $2 that I had paid Miss Gallagher. "Well," he said, "Miss Gallagher is $2 ahead. I would rather die than give you a blue receipt for $2 that you paid Miss Gallagher." He also said that the Singer Sewing Machine Company thought Miss Gallagher no fit person to sell their machines, and that they would not be responsible for the machine that she had sold. (I also said to Mr. Dorsey one day, "Are you not afraid to talk about Miss Gallagher the way you do?" "Why," he says, "I am authorized by the Singer Sewing Machine Company in all I am saying and doing about her.") I do not know what newspaper it was that Dorsey tapped, or what was in it.

Mrs. Morsbach.  Mr. Dorsey in June, 1906, or before, called on me and wanted to know if I had bought a machine from Emma Gallagher. I told him no, that she had simply left the machine there for trial. He said the Singer Sewing Machine Company had sent him to tell me that Emma Gallagher was discharged from the Company for forgery; that she was not authorized to sell any more machines and for me not to buy any machines from her, and he said also he wanted a copy of my signature to compare with one they had in their office that was signed to a lease or contract and I told him I had never signed any lease or contract and I asked him to show me the contract. He said no, the Company did not want the contract to leave their possession, and if I would put my signature down on paper, he would take that to them for comparison. He referred to Singer Sewing Machine Company. He said that company sent him to me to tell me that. He did not ask me to pay anything on the contract. He did not say he came to collect.

F. M. Lambin.  That he was auditor of The Tribune Company and that its circulation was approximately 140,000 and identifies a copy of The Chicago Tribune of June 4, 1907, containing the libel in question, and that in the regular course of business the bill against appellant for the insertion of the said advertisement or libel would have been rendered shortly after the insertion of the advertisement in The Tribune; that it is hard to say how soon thereafter; that it might have been two days, or four or more days depending on the press of business.

Annie Edgell.  I was employed by The Tribune Company as bill clerk in June, 1907. I made out a bill to the Singer Company for an advertisement published on June 4, 1907. I don't remember the date particularly. I suppose if I saw the bills I could tell. I know I made this out (referring to the bill). This bill is June 4th, so that must be the date I made it out. Under the usual custom at that time at that office the

bill would be made out two days after it was inserted in the paper, and after I got through with it, it was handed over to a girl to check the bill, and she handed it to the boy and mailed it. All the Tuesday bills were made out on Wednesday by me and handed to the checker, who, in turn, handed them to the office boy to mail. I know that was their practice, because she would check them in about the same day that she got them from me and then she handed them to the office boy and mailed them the same night. I don't know about that particular bill (bill in question). At time the bill was made out the words, "Received June 11, 1907, Singer Sewing Machine Company, Mgr. Trade Dept." did not appear on the bill. I don't know of my own personal knowledge when that bill was mailed. I don't know whether I made it out in one, two or three days after the date June 4th. The bill is marked "Corrected bill." That means the bill was corrected and there must have been a first bill sent. I have no independent recollection about the matter. The bill would bear the date it was put in the paper, no matter when I made it out.

Frankie Grocox. I was employed as checker of D. O. bills or what is called telephone ads by The Tribune Company. Such bills were billed out at once. I have seen the bill in question twice before, the first time when I checked it from the copy when it was mailed out to the customers. I checked it from the copy of Wednesday, the day after it appeared in the paper. After I checked it I gave it to the office boy and saw him mail it out. I remember it particularly. I am sure it was checked and mailed the very next day after it appeared in the paper.

The said bill introduced in evidence is a bill in usual form by Tribune Company to appellant, "for advertising received over the telephone." The date of bill is "June 4, 07," and the amount $1.12. The bill is endorsed as received by appellant June 11, 1907.

The document containing the alleged libel, as writ-

ten out June 3, 1907, by Miss Murray is introduced in evidence and is in the words set forth in the declaration.

Copy of The Chicago Tribune of June 4, 1907, and particularly the alleged ad or libel appearing therein and which is in same words as set forth in the declaration.

Emma Gallagher. I am forty-nine years old and live in Chicago. I began working for Singer Manufacturing Company in 1899 at Ogden avenue, Chicago, selling Singer sewing machines, and worked there until January, 1904, until 1902 under Mr. Stokes. I began work under Mr. Tatro in 1902, and in January, 1904, he sent me to Evanston, where I worked until December 20, 1904. I was manager of the store there. I then worked at Wilson avenue until March, 1905, and in January, 1905, we began to use the name, Singer Sewing Machine Company. In 1905 I wanted to establish a store for myself at Wilson avenue and told Mr. Tatro so. He told me it took a corporation to keep a store there, that I must not do that. I intended to go into business for myself and put $5 on a store at 1914 Evanston avenue. He told me he wanted me to go to 43rd street, and I told him that I did not want to stay with the Company; that I would go into business for myself and make from three to five thousand a year. I wrote my resignation and sent it to him. He told me if I would remain with the Singer Sewing Machine Company they would pension me and to go to any store they had, and he would tell them to give me $25 per week and to take his advice. Then he sent out Mr. Grumwald, one of the company's managers, to be manager in my place. He told me he sent Grumwald to assist me and that I was to have same privileges as Grumwald. I told him I could not consent to work for Grumwald, as he knew so little about the business. He then sent me to Colorado avenue and I told Pierce Powers there that I thought of stopping there. I rang up Mr. Tatro and he told me that

was all right, that he had saved the company a car load of machines by getting me to remain with him. I stayed there two weeks. The man there was drinking all the time I was there. After writing Tatro he phoned me he was going to New York. I said, "Mr. Tatro, it is by following your advice I got into this trouble." He said I must go back to Wilson avenue as manager. When I got there DeVine Cummings was in charge and I told him Tatro sent me to take charge of the store. He told me he had charge of it. I said I would quit. I resigned from the Company and went down to the Wheeler & Wilson office, 72 Wabash avenue, and made a contract there. The duties of manager under the Singer Sewing Machine Company, as given to me by oral instructions from Tatro, were to hire and discharge help, break down all competition, and when I wanted help to advertise in the Chicago papers. I began to manage the store for the Wheeler & Wilson Sewing Machine Company in April, 1905, at 1832 Wilson avenue, two doors from the Singer Company, and remained there until November 7, 1905, when the Singer Sewing Machine Company bought out the Wheeler & Wilson. After Mr. Tatro came from New York, and while I worked for the Wheeler & Wilson, he told me I had done a very wrong thing to go to the Wheeler & Wilson, and wanted me to go back to the Singer Sewing Machine Company. I told him I was perfectly satisfied. While I was at Wheeler & Wilson's, Dorsey was in the Singer office two doors from me. I would go out to get into my buggy and he would come out and say, "Emma Gallagher, the sewing machine lady of Sheridan Park. We cannot sell any machines on her account." Oh, he (Dorsey) used to follow me around and stop wherever he could see me and take the number of the house that I was in. When I would speak to him, he would tell me I did not own my horse. He would follow me in his machine buggy. I phoned Tatro I wanted that stopped and he said he would send somebody out to attend to it. He sent out

his assistant, Mr. Fred Smidl, who was then chief clerk of all the states. Smidl told me I must expect that as long as I was working for the opposition and that the only thing left for me to do was to go back to the Singer Company. I told him I was not going back. These occurrences were probably in June, 1905. Mr. Cummings also came out there once, on account of Dorsey getting drunk and cutting up so. Dorsey was drunk in his wagon once and the street cars ran over the wagon. I told Cummings I would not stand for the insulting things Dorsey was saying to me and he said it was not Dorsey's fault, that it was malice. Cummings was supervisor for the North Side. He overlooked the managers. He also said there was nothing for me to do but to come back to the Singer Company. I wrote a letter to Tatro September 15, 1905, which reads as follows:

"I called at your office this morning at the appointed time, but was informed by the clerk at the rail that you were too much occupied with other matters to see anybody. I explained that the appointment was at your suggestion, but all to no avail. Two letters which I have written you have brought forth no response, but I feel confident that they have never reached your hands. However, to come to the point, I am anxious to renew my connection with the Singer people at the earliest possible date. Would prefer to open a "Women's Office" with women as sale agents exclusively. If that isn't entirely in line with your wishes, at just this particular time, I would like very much to take charge of your office at 1826 Evanston avenue (Dorsey's store). Could also bring two strong salesmen with me. I can build up this district solid for the Singer Company just as I am now doing for the Wheeler.

"If you have been advised of the recent disgraceful escapades of the present manager at that point you will recognize the need of an immediate change. Our interests are mutual. You want managers who can command the respect of the community and produce a maximum business in their respective districts. My

own record with your company stands on its merits. Your books tell the whole story.

"Kindly upon receipt of this communication, call me up by 'phone (Lakeview 899) so that a definite appointment can be arranged when we can go over all matters in person. I am addressing you at your home to insure positive and early delivery."

Mr. Tatro replied, September 16, 1905, as follows:

"We are in receipt of your favor of the 15th inst., addressed to our Mr. M. M. Tatro and at his request, we wish to inform you that all the letters which you addressed to him were received, but we were too crowded with other work to give them specific attention. And as we have repeatedly informed you, we have no proposition to offer, such as you suggest, namely a women's store and furthermore, you have engaged with the W. & W. Co., and it is entirely out of the question to place you in charge of our Wilson Ave. or any other store. If you desire to be re-employed by our Company, we must again repeat as we have often informed you, that you make an application, for which purpose you took with you several blank applications on your last visit. Send them to us and we will refer them to one of our Supervisors for attention and probably they can place you in a position that you are deserving of. You can make up your mind, however, that it will not be a position as M. S. in any store. We trust you will discontinue your correspondence in the future, as these matters are always taken up with our Supervising Agent, and it is up to him to place you in a position which is fitting in your case."

The witness continuing: The abbreviation in his letter, M. S., means managing salesman. In October Mr. Tatro said to me, "We have not heard from you since we wrote you." "No," I said, "You make promises and when you get to your office your promises mean nothing." November 8th Mr. Cummings came in and said, "We own your store, you are again in the employ of the Singer Sewing Machine Company." I phoned to the manager of the Wheeler & Wilson and he said, "Yes, Miss Gallagher, come down." I went

down and Mr. Tatro was there and told me I was to put Singer and Wheeler & Wilson sewing machines on my floor and that I must not talk anything against the Singer, that the Singer owned the Wheeler now. I then went into Dorsey's store and told him that I wanted some Singer Sewing Machines; that Mr. Tatro told me he wanted them on my floor. Dorsey said he would not give me any machines. He did not have any for me. I phoned Tatro about it and he came and said, "All right, I will tell him that I want Singer machines put on that floor." He then told me to go into Dorsey's and get them. I went in and Dorsey commenced to uncrate them and as he did he scratched nails over the new machine he was uncrating, one I had to sell. This went on that way until Dec. 9, 1905. Then Cummings came into my store and brought Dorsey and told me that Tatro said to move my store into Dorsey's store, the one Dorsey was manager of, and they moved my store into Dorsey's. I asked Cummings where I was to go and he told me I was to work under Dorsey. I said, "No, I am not; I am going to quit then. I was told to stay at my post and now you are telling me to work under Dorsey." Next morning Cummings said, "Mr. Tatro says for you to go down to 1357 N. Clark St. and work for $25 a week and I will go there and give the manager that instruction." I reported there next morning and began work at that price. I was there about a month in January, 1906, and Cummings told me that it was the Company's future policy that each one should assume a lease store, that the company should furnish the store and we should work under the 1904 commission contract. I said "all right." He said you find a store just as quick as you can and we will furnish it up. I rented a store at 1981 Evanston avenue, and Cummings furnished it, sent me about twenty-five machines, Singer and Wheeler & Wilson machines, oils, belts, etc. I paid rent and assumed the lease. No sooner had I

got that store fitted up than the same Cummings told me I had to go to Clark St., or some place out of that district; that the Company had rented the store at 1308 Wilson avenue and that Dorsey could do no business if I was up there. I said, "Well, I can't get out of the lease of this store." He said, "Yes, you will get out of the lease of this store." I said, "I don't do business that way. I am not going to do it." I called up Tatro and he sent out Mr. Smidl who told me Tatro said I would either have to move to Clark St. or some other place, or he would take the machines away from me. I told him I would not move to Clark St., that I intended to stay just where I was, so he phoned to Tatro and Tatro phoned to me, "Miss Gallagher, if you want to keep those machines out there, you will have to go to some other place, because the Company is caught for a lease on an office there at 1308 Wilson avenue, and we intend to move there May 1, and you will have to abandon that office or go in with Dorsey." I told him I would not do that. He said, "All right call Mr. Smidl to the phone." After going to the phone Smidl said, "Miss Gallagher, Mr. Tatro says for me to take all these machines away from you. I feel sorry, but I can't do anything." I said go ahead and act. Then he took every one of those machines away from me and left an empty store on my hands. Then I wrote Tatro January 29, 1906, as follows:

"A very peculiar circumstance has arisen and is of such importance as to merit your personal attention. On the 20th of January, with the approval of Mr. D. M. Cummings, supervisor, I opened a new store at 1981 Evanston Ave., and assumed the lease up to April 30th, 1906. All of the expenses in connection with this arrangement I have borne personally, the Singer Sewing Machine Company being out absolutely not one penny either on account of the fitting up of the store, or the rental for the period in question. Hardly had I gotten the store fixed up for business when this same Mr. Cummings advised me over the 'phone this morning that it would be necessary for me to close this

store and move to Clark street or some other place not so favorably located as my present store. The reason for this you may well guess. Some petty jealousies have sprung up among the neighboring managing salesmen and the whole business I am satisfied is nothing more or less than a piece of spite work. As a just man, I submit to you that this latest procedure is anything but fair. Your books will show my record for the six or seven years I have been in the employ of the Singer Company. You personally know that I have made good in every sense of the term; and it hurts me to be treated shabbily, to say nothing of being burdened with the heavy expense on account of having assumed the lease for my Evanston avenue store. Moreover, I feel that in view of my many years of faithful service, that the salary arrangement should continue as heretofore upon the minimum basis of $25.00 weekly. I have been and will continue to sell as many machines as any other agency of this size, and I know that your company is looking for profit, and that you desire to mete out justice to those who have proven themselves worthy. I look to you, therefore, Mr. Tatro, for redress in this matter. I like the Singer Company and want to remain in their service. Kindly advise me immediately upon receipt of this, that it is agreeable to you that my store remain intact, and that my contract for services with the Company will be at least $25.00 per week straight salary. Assuring you of my appreciation of the many courtesies you have extended me, and thanking you in advance for your kind approval of the plan as I have outlined it, I remain."

Afterwards, Dorsey came to my store and said Tatro sent him to make me a proposition. I told Dorsey I would not interview him and Mr. Schofield, my attorney, went and saw Mr. Tatro. I went to the White Sewing Machine Company and they sent me twenty-five or thirty machines. After I signed a contract with that company, Mr. Tatro sent Smidl to the White office, and Mr. Cahee told him I had signed a contract. Then I began selling White sewing machines at 1981 Evanston avenue, and Dorsey and

the man working under him and other agents of the Singer started calling on my customers. I was so annoyed I wrote Tatro a letter February 14th. It was in response to that letter that Dorsey came. I had had Mr. Schofield institute a suit against the Singer Sewing Machine Company, M. M. Tatro and T. F. Dorsey in the Circuit Court. Then I went to see Mr. Tatro about a bill of sale that a lady had not got for a machine I sold. Mr. Tatro said, "Come into the office. I want to see you." He closed the door and called in Mr. Roe and Hattie Black. He said, "Now I want you to withdraw that suit you have instituted against this company. This is a powerful corporation. You are a foolish woman to try to institute a suit against a big corporation like this. We are the biggest corporation in the world and what can you do with us? We will buy up the judges, your lawyers, the jury, your court reporters, everything connected with your case. And you will be penniless. Nobody that has ever instituted a suit against this company has been able to go on with it. We will nonsuit you." I said, "Well, I would go on with it and see whether might or right should prevail." He kept me there and kept insisting about it. He related different ones that had instituted suits against the company. He told me there was a man in New Jersey that had lost an arm, that instituted a suit against the company and that it had gone on for thirteen years and finally the man died penniless in the poorhouse, and such would be the end of me if I did not withdraw my suit. Finally, I told him I would go see Mr. Schofield. He said, "No, you must sign this contract now," that if I would withdraw that suit that he would see that the Singer Company would always give me good positions, that they would give me a life job; that I could get rid of my horse and wagon and have no expenses and give me a life job at 72 Wabash avenue, commencing at $16 per week. I read the contract over and said,

"you have not got this in the contract (a life job)."
He said, "That is against the rules of the company,
but you can trust me to see that you will be taken care
of for life." I signed the paper and withdrew the
suit, which was begun about Feb. 14, 1906. He gave
me $100 and bought my wagon that I paid $64 for, at
$35. He would not let me go to see Mr. Schofield until
I had done all that.

The contract in full was then introduced in evidence,
which was a release to the company for $100, dated
March 30, 1906, acknowledging receipt for same in full
satisfaction of all claims of any nature, including
claims against the said parties by her sued in said suit,
with agreement to dismiss the same without cost to
defendants, which was signed by witness.

Emma Gallagher continuing: After I signed that
release Mr. Tatro wanted to take me over to 72 Wa-
bash avenue that day and I told him no, I was under
such a severe nervous strain that I could not go. He
said, "All right, I will take you over there Monday."
I worked there as saleslady until May 1, 1906.
Tatro then wanted me to go to the Wilson avenue
store. I told him I loved Wilson avenue, but I could
not work under Dorsey directly or indirectly. He
said the company had sent Dorsey to take the Keeley
cure and that he was then a trusted employee. I told
him I would not work under that low ebb of a man
and that I would have nothing to do with him. He
said he had to have me there and to meet him there
next day, May 1, 1906, which I did. Mr. Tatro, Cum-
mings and I met at Dorsey's, and Tatro said to Dorsey,
"I am bringing Miss Gallagher to work for you," and
to me said, "Mr. Dorsey has charge of you now. All
your future dealings with the company must be
through our manager, Dorsey, and the company's deal-
ings with you shall be through him. You shall have
no further communication with the central office and
me." Then I commenced to cry. Dorsey said to me,
"You will have to obey me in everything, right or

wrong." I was still crying and Mr. Tatro came out of the back room by me and said, "Don't let me hear of an alliance." I don't know what he meant by it. It was uncalled for in any way. Then Dorsey used to put his hands over the door and say to me, "Why don't you quit? The company don't want you; they have put you under me to get rid of you." And he used to work and credit all the sales to himself and son, and when I would say, "Where are my sales?" he said, "You don't need any." I was making all the sales on the floor. So on May 24, 1906, I put on my hat and went down to see Mr. Tatro. He grabbed up his hat when he saw me and said, "My sister is sick at the hospital and has to be operated on today. I will phone when I can see you." Next day, May 25, I received a letter from him as follows:

"When you were in here yesterday, our Mr. Tatro told you that he would let you know when he would be able to see you. At the present time he is very busy and also has sickness in his family and under the circumstances will be unable to see you. We might say that Mr. Dorsey is the manager of your store and if you cannot get along with him, we would advise that you resign and place yourself in the hands of Mr. Cummings, who is Supervisor for that district and he may be able to do something for you. We think it unnecessary to say that Mr. Tatro has not the time to go into the detail work, and we, therefore, ask that you take up the matter as stated above."

I saw Mr. Cummings, May 26th, and told him the treatment I was receiving at the hands of Dorsey. He told me Dorsey was the authorized agent of the company and that the company would not interfere with him, and, moreover, that I was blacklisted by the company. I then, May 31, 1906, wrote Mr. Tatro as follows:

"Under a solemn promise from you to always take care of me by seeing that I had good positions with the Singer Sewing Machine Company, you persuaded me to withdraw my suit from the Circuit Court of

Gallagher v. Singer Sewing Machine Co., 177 Ill. App. 198.

Cook County against the Singer Sewing Machine Company. When I asked that this promise be incorporated in the written agreement I signed under a severe nervous strain, you explained that it was against the rules of the Singer Sewing Machine Company to put it in the written agreement; but that I could trust you to see that I would be given a good position with the company and taken care of in an absolutely satisfactory manner. I could very much better tell you about present conditions in a personal interview, but under the circumstances, I shall try and lay the facts before you in this communication. When re-entering your service, and at the time of being transferred to the Wilson avenue store you agreed my salary should be sixteen dollars ($16.00) a week in consideration of making sales in the store, also to go out after store prospects and close 'phone orders. This store is realizing its proposition, but Mr. Dorsey is crediting the orders and 'phone orders to himself and son. The Company is paying sixty-one dollars ($61.00) a week for sales that should cost them only the amount of my salary. Moreover, I have to canvass and get my sales on the outside. This is not in accordance with our agreement, and I want to ask you please, to make such arrangements as will make it possible for me to show my ability on the floor, and not be handicapped and crushed out. I can get you the schedule, eight sales here in the store that is costing the Company one hundred and twenty-nine dollars ($129.00) a week for my salary. I am depending on your honor as a man, believing that your word is as good as your bonds, and certainly expect that the Singer Sewing Machine Company shall live up to its agreement.''

Next morning Tatro sent for me. When I got there at his office he took me into the cloak room and Fred Roe, DeVine Cummings and Thomas Dorsey were present. Reading from my said last letter he said, ''How dare you to be so presumptuous as to interfere with the company's instructions to its manager, Mr. Dorsey? I will have you incarcerated in a lunatic

asylum." I jumped up and said, "I will have you and the Singer Sewing Machine Company indicted for conspiracy." Then he got excited, threw his hands out and said, "I defy any man in this room to discharge you." I rushed out and they all rushed after me. Fred Roe put his hands across the elevator door and stopped me from going down. He brought me back and got me pacified. He told me I was excited, to sit a few minutes, Mr. Tatro wanted to talk to me. I told him I would not speak to anybody, I was not able to speak. I went home. On following Monday I rang up Mr. Tatro and told him, "You have doné very wrong with me". He said, "Never mind, I had to do that, those three women at Wabash hate you." I said he was a very weak-minded man and that way down in his heart he knew that hatred existed and was only jealousy. . I am not able to go back to the store and will not. He said, "You must not leave the company. You stay at home and draw your wages." "I don't do business that way. You have got to do something," I said. He said, "All right, I will be out in a few days." June 8th he sent Mr. Ormerod to me who said, "What do you want the company to do for you?" I said, "I am not going to be insulted by this low ebbed man any longer. I want you to put in another store out here of my own." He said that was against the company's rules and that the only store that could be out there was the one Dorsey was in, that the company was tied there with a lease for three years and all sales had to come from that store. I said I would quit the company and wanted to be let alone. I told Dorsey I had resigned and wanted my money. He handed me my money and said, "Thank heavens for that." Then I started right there and then. June 11th I rented a store for a sewing machine repair shop at 1242 Ainsley street. Next day Dorsey, Simpson and another man came by in a wagon and stood in front of the store and said, "Hurray". I was standing in the window. Then I occupied a little store at 1203 Wilson avenue and commenced selling

all makes of sewing machines, Singers and Wheelers and Whites, etc. Mr. Jarrow, who worked for the Singer Company, put in Singer and Wheeler & Wilson machines and Dorsey came along and saw the machines in stock and said, ''I will have those machines taken out.'' DeVine Cummings came into the store and said, ''Those machines have got to be removed. The only store that can sell in this district is the store we are running at 1308 Wilson avenue, as we have told you repeatedly.'' Then they took away those machines. I then called up Pierce Powers of the Singer Company and said, ''Will you furnish me Singers and Wheeler & Wilson machines?'' He said, ''Hush, don't say any more, hang up the receiver, give me your number and I will go next door and talk to you.'' In a few minutes he called me and said, ''Yes, I will furnish them,'' and he did furnish me fourteen machines at 6 Colorado avenue. He had charge of the west side stores of the Singer as supervisor of stores. I wrote to Mr. Tatro July 19, 1906, as follows:

''You are already familiar with the facts in the case and know all about the abuse and vituperation which has been heaped upon me, and at whose instance insult has been added to injury; still a brief summary of events since I was compelled to resign my position with the Singer Sewing Machine Co., June 9th and went into the sewing machine repair business, will serve to make my point more clear. Not content with maligning me while in the employ of the Singer Sewing Machine Co., your representatives continued to annoy me in my present business and have seemingly done everything that possibly could be done to damage my business and drag my good name down by circulating false statements about me. As a direct result of this base calumny, I have lost fourteen sewing machine repair jobs during the last month. Not only have your employees conjured up these fabrications, but they have also gone so far as to tell the trade that they were authorized by the Central Office of the Singer Sewing Machine Co. to circulate these statements;

furthermore, that the Singer Sewing Machine Co. would back them in anything and everything they might do to put me out of business. They have succeeded; I cannot make my living out of my repair shop. My business is ruined. Nor is this all. (I also opened a sewing machine store, taking Mr. Benzion as my partner. We were supplied with several Singer and Wheeler machines by Mr. Jarrow of 358 E. North ave.) One of these machines I sold to Mrs. H. A. Smith, 2043 Kenmore ave., and received $11.80 on the sale. (The fact was evidently brought to the attention of your company), for I was informed that my name would have to be omitted from the lease, as the Singer Sewing Machine Company did not consider me 'a fit person to sell their machines'. (In confirmation of this, Mr. D. M. Cummings, Supervising Agt., ordered all of the Singer and Wheeler machines to be taken out of our store,) simply for the reason that I was handling them. At the same time, Mr. Cummings sent word to Mr. Benzion, my partner, that he could handle the line if he would eject me from the premises. Now, Mr. Tatro, you know down deep in your heart the injustice that has been done me by your company. But remember this. I shall be vindicated. Redress must be made in all haste and the financial losses which I have sustained at the hands of your people must be made good by the Singer Sewing Machine Co.

I shall expect your assurance by return post that this will be done. Not hearing from you by July 27th at the latest, I will take such action as the case demands.''

Mr. Tatro replied, July 27, 1906, as follows:

''Your communication of the 19th inst. received, and contents noted. You must be mistaken when you say that the employees of the Singer Sewing Machine Company are annoying you in your present business and injuring your good name by circulating false statements about you, as all of the agents of the Company have been expressly instructed to conduct the business of the Company in a legitimate way and in no way to trespass upon the rights of others much less to injure them in their good name, and should it appear

that any person connected with the Company circulated false statements about anyone, it is absolutely without authority of the Company and against the Company's instructions.

"No agent of the Company has any authority whatever to place the machines of the Company on sale or in a store for sale other than in the regular agencies of the company, as it is against the policy of the Company. Consequently, Mr. Jarrow had no authority to place machines in the store with yourself and Mr. Benzion, and upon notice being brought to the Company of his having done so, he was instructed to discontinue any such arrangement. There was nothing whatever personal in this instruction, but it was done simply because his act was directly contrary to the policy of the Company.

"I don't believe the Company has ever done you an injustice and am satisfied that the injuries that you complain of, if real, and lay to the Company arise from other causes with which the Company is in no way connected. I fear that the bodily pain and suffering that you have endured on account of serious physical injury you sustained in times past has caused you to look at the world through colored glasses and to conceive that people are against you and working against you who would really be your friends if you permitted and would do you favors rather than injuries."

After I received that letter I instituted another suit against the company. Mr. Powers ceased to furnish me machines in January, 1907, and told me he would be discharged from the company if he furnished me any more machines. In January, 1907, I went to the Central office to see Mr. Tatro. Mr. Roe said Mr. Tatro was busy. I asked him why the company stopped me from selling machines. He said I would have to go to the company's attorneys and withdraw my suit. I told him the company would have to go to my attorney, Mr. Schofield; that my brother was supporting me and that Dorsey was going around still slandering me from house to house. He told me if I would withdraw my suit that the company would have

Dorsey cease; that the Singer was above the law and I could not make them observe it. Mr. Tatro was behind the door listening in his private office to what I had to say. I said, "Tell that Czar of Russia to come out and talk to me." Then Mr. Tatro sent Mr. McClure to talk to me and Mr. Tatro pushed the door. I did not see where he went. McClure said, "You take a friend's advice. This is the biggest corporation in the world. What can you do with them?" I said, "I will see whether right or might shall prevail in this our land of the free." He said that when my case came up they would put it back for three or four years; take a friend's advice and withdraw your suit. (She then says that this occurred May 30, 1907). I went down last day of May, 1907, to see Mr. Tatro to collect some commissions they owed me. Mr. Roe told me to go out and collect that money on other machines. I was collecting on the machines the day the Singer Company put me in the newspaper. He also told me the Singer Sewing Machine Company would compel me to stop selling Singer sewing machines. I said that the Singer sewing machines were the same as apples or newsies for anybody to sell; that they could not stop me selling them. I told him my earning capacity had been reduced to nothing; that I was not able to make my living any more and that I was penniless. I was a cashier, bookkeeper and stenographer, but since I have been disabled I am not able to do that now. After the publication of the article in the paper, June 4, 1907, I went to the White Company. I could not get a contract. Mr. Spurling told me that Mr. Tatro had forbidden him to furnish me with any more machines under penalty of being discharged, and that Dorsey had followed his wagon to Mrs. Turney's and took the number of the sewing machine. I had conversations with Mr. Tatro in 1904 and 1905 when I was made manager as to what the duties of managers were. I never talked with him about those matters after that.

In February, 1905, he told me the duties of managers were to hire and discharge employees and give account to the company why they were discharged, break down all competition, take charge of sales, and disbursements of cash, pay rent, salaries, advertising, telephone, fuel and constable fees, and turn in a weekly report to the central office and to send in my balance. Those were the verbal instructions. Mr. Dorsey, as manager, hired and discharged help, paid salaries and advertising, rents, fuel, telephoning and sent in a weekly report to the central office. I was never discharged by the company for forgery and never forged anybody's name to any contract or leases for machines. (Appellant here by attorney made statement that there is no claim of such a discharge or that she forged anything.) I have suffered mental anguish and for months after I got the advertisement I could neither eat nor sleep. Mr. Tatro was our highest authority in Illinois. When we were made managers, or if anything came up, Mr. Tatro was the one that gave us verbal instructions, or else he gave them to the supervisors to give us, and the supervisors then gave the instructions to the managers. If he was busy the supervisors would do it, but he generally did it himself. I saw him give instructions to employees. Mr. Tatro was agent for about ten states, including Illinois. The central office was 804 Cable building, and he was the head of that office. No one was above him in Illinois. The Singer Company has about three thousand employees in Illinois. I had no enemies in Chicago on June 3rd or 4th, 1907, but the Singer, Mr. Dorsey, Mr. Tatro and Mr. Roe of the Singer Sewing Machine Company.

Cross-examination. Mr. Tatro put me back different times as manager with Mr. Grumwald. I said in March, 1905, I would not work under Grumwald, because he knew so little about the business. I wrote my resignation and told Mr. Tatro that was my rea-

son. I left the place at Colorado avenue after about two weeks on account of Pierce Powers being drunk all the time. Powers is the man I was friendly with afterwards. When I was sent to Wilson avenue Mr. Cummings was there and when he told me he was manager when I got there, I told him I would quit. Mr. Tatro is the managing salesman of ten or more states. The agency is called the Chicago Central Agency, which means that it is an agency that includes several states. That is what Mr. Tatro is the general sales agent of. Managing salesmen have their assistant managing salesmen, and the other people are the sales agents, and the purpose of the whole force here is to sell sewing machines. The supervisors go to the different stores and see that everything is right, that they are selling as many machines as they should, how much stock on hand they have, and they check up the reports at the central office. The managing salesman talks to the supervisor and the supervisor to Mr. Tatro. If Mr. Tatro has not time to talk to the managing salesmen, he sees the supervisors and gives them his instructions, which they give to the managing salesmen, and if the supervisor sees that the man under him is not selling as many machines as he ought to sell, is carrying too big a stock, is not collecting enough money on accounts, letting them stand out, he talks to him about it. The manager sends the money to the central office weekly. The chief clerk's duty is to tabulate these reports and if anything is left after paying expenses of the local office, it is sent on to the executive office in New York. Mr. Dorsey advertised in the Tribune and in the News. I know he did in 1905 in December. The managing salesmen did advertising in 1905, 1906, 1907 and 1908. They are not under contract not to advertise. Dorsey was not, I was not. (Whereupon counsel reads from her contract of April 24, 1906, as follows): "Fifth. Said party of second part (Emma Gallagher) is not authorized to pledge the credit of the company in any way,

nor to bring or permit any suit without express authority from the Company,  *  *  *  nor to advertise in any manner, nor to rent or agree to rent or hire any store, office, barn, stable, or other tenement.''

She, continuing, said: ''I am the only person that I know Tatro instructed to advertise, but I have seen them all do it. I can not name one that did it. I can not fix a date that I ever put an advertisement in the papers for the company. Whenever I had any trouble, I tried to go to Tatro to get it straightened out. He tried to be kind to me, and went around to different places to help me get things straightened out, so I could continue with the Company until I took the store at Wilson avenue. He told me I could not be manager there, because he had that party there. The trouble was I wanted to get a store separate for myself, and Mr. Ormerod told me it was against the rules of the Company for me to do that. I wanted a store for myself, and for them to fit it up for me. I would not be in the store under Dorsey. Mr. Tatro was kind seemingly and considerate of me, up to the time I had this talk in 1906, when he said I was crazy. Up to June 4, 1907, I never asked the Singer Company for permission to work on a regular commission contract and have it refused me. Mr. Tatro wrote me to the effect that I must take my matters up with the supervisor or the manager. I knew that was the custom. I knew it was against the policy of the Singer Sewing Machine Company to employ agents that were not under contract, and that they had to have a contract. I knew that when I got the machines from Spurling and Powers.''

As about all of appellee's evidence in chief is objected to by appellant, and as it is apparent that the great bulk thereof, and particularly of her own testimony, is inadmissible because immaterial, irrelevant, hearsay or otherwise improper and objectionable, it will be necessary to first point out in a general way the

evidence that is not subject to the objections raised to it and saved in the trial of the case. The evidence of Margaret Murray, as above set forth, the admission of appellant following her testimony, the libel written out by Miss Murray, as dictated to her over the phone, the copy thereof printed in The Chicago Daily Tribune of June 4, 1907, and the copy of said paper of said date introduced in evidence, were all proper evidence to be considered by the jury, after the introduction by appellee of the other portions of her evidence which we will point out later. The foregoing evidence considered alone lacked one bit of proof to admit these portions of the evidence, the identity of the unknown party who phoned the libelous matter to Miss Murray, as an agent of appellant. It is improper for a court to admit in evidence telephone conversations in which the witness testifying to such conversations cannot identify the speaker as the party he represents himself to be, by his voice, if the speaker is not shown to be talking at his own phone number, or at the phone number of the person he purports to represent, and is not otherwise identified by facts and circumstances as such speaker. Wigmore on Evidence, vol. 3, sec. 2155; Rueckheim Bros. & Eckstein v. SerVis Ice C. & C. Co., 146 Ill. App. 607; Vaughn v. State, 130 Ala. 18; Dunham v. McMichael, 214 Pa. St. 485.

It is the law that if there is no competent evidence tending to prove that appellant authorized, or is responsible for, the phoning of the libelous matter to Miss Murray, such libel and its publication in the newspaper were inadmissible. Thompson on Trials, sec. 318; Bent & Cottrel v. Mink, 46 Iowa 576; Prussing v. Jackson, 208 Ill. 85.

The converse of said proposition is true, too, that if appellant authorized the libel, or was responsible for the act of the party who furnished it to Miss Murray, then the libel and the publication thereof and the phone message and said admission as to appellant's

phone number and address are all proper evidence. There are other facts and circumstances in the record tending to prove that some authorized agent of appellant, or agent for whose acts appellant was bound, phoned the libel to Miss Murray, which will be pointed out later. If therefrom the jury should find an authorized agent sent the telephone message, then all of Miss Murray's evidence should be considered material and competent, for it is clearly and indisputably proved that The Tribune Company received the libelous matter from the libeler over the phone. If the libeler was an authorized agent of appellant, or an agent by whose acts appellant is bound, the statement to Miss Murray that the message was sent from phone No. 4409 Harrison at 209 Jackson boulevard, Chicago, is binding on appellant, as it was the giving of the correct phone number and address of appellant by such agent that induced her to receive the message as the genuine message of appellant. ''When a person places himself in connection with the telephone system through an instrument in his office, he thereby invites communication, in relation to his business, through that channel.'' Conversations held over such phone by him, or by any authorized person for him, or by one professing to represent him, in relation to his business carried on there, are admissible. ''The fact that the voice at the phone was not identified does not render the conversation inadmissible.'' Wolfe v. Missouri Pac. Ry. Co., 97 Mo. 473; Godair v. Ham Nat. Bank, 225 Ill. 572; rev'g, 128 Ill. App. 293; Wicks v. Wheeler, 157 Ill. App. 578; Barrett v. Magner, 105 Minn. 118.

In the trial of this case it was competent for appellee to prove malice toward her, and a motive for libeling her, on the part of appellant, if such malice and motive existed. The origin of the circumstances, if any, tending to show such malice and motive, ought to be the first existence in point of time as an element of substantial proof in establishing the libel. This is ele-

mentary and ought not to require authority or discussion to support the position. That motive may be proved in civil as well as in criminal cases to establish guilt in tort is a well recognized principle of the law, as will be found by consulting Wigmore on Evidence, and authorities by him cited in volume 1, secs. 389, 399 and 401. It was unnecessary to incumber the record with a detailed history of the life of appellee, or even of her entire employment with appellant, in order to determine if appellant had libeled her. The evidence simply shows that up to the bringing of her first suit against appellant, Mr. Tatro and Mr. Dorsey in February, 1906, appellee was not content to work under any employee of appellant as manager, and that all the trouble she recites up to that time grew out of this very fact, and the further fact that she insisted on starting a store of her own, either for herself alone, or for the company, where she would have full control, and could run the same with female help. Mr. Tatro and the Company would not hear to that, because her plan was against the business policy of the Company, as it insisted on selling its own machines and managing its own affairs, and would allow no one to sell its sewing machines, unless they were under contract and bond with it as its agent. The evidence of appellant's witnesses clearly showed that she was not disposed to be controlled by the managers under whom she was placed, and that she sought to discredit and supersede them by various complaints and representations to Mr. Tatro, the representative of appellant in the selling of machines at the Chicago Central Agency. Another source of her troubles was in her insisting in taking all her complaints, as an agent, to Mr. Tatro, instead of presenting them to the supervisors, the proper ones to settle such matters. Her own evidence clearly shows these matters, and that she, while not an agent, persisted in obtaining from appellant's agents and selling Singer machines under cover and

establishing stores for the sale of the same, contrary to the methods and expressed wishes of the Company which she well understood. Her methods were well calculated to cause ill feeling towards her on the part of the managers and those with whom she worked, and finally ill feeling on the part of Mr. Tatro, and that seems from the evidence to be the things that happened. The evidence, however, clearly shows that up to the time of the bringing of her first suit, Mr. Tatro and the Company bore no malice or ill feeling towards her, and treated her with very much consideration and forbearance; and that whatever of ill feeling, if any, that existed between appellee and Dorsey, or any other of appellant's agents or employees, was merely personal between them and her, and was not sanctioned by the Company. She testified in her cross-examination that Mr. Tatro was kind and considerate of her apparently until the time he told her she was crazy, June 1, 1906. She also states that from the time she last worked for appellant in June, 1906, up to June 4, 1907, she never asked appellant for permission to work on a regular commission contract and have that request denied her. It was between those last two dates that she established a repair shop and finally a store on her own account, and at which she was selling Singer and Wheeler & Wilson machines, secured under cover from the agents of appellant and against the express orders of appellant. It was during this period that the Company, through Dorsey, Cummings and Tatro, as her evidence tended to show, were doing their utmost to prevent appellee from selling their machines, and she was apparently doing her utmost to continue such sales. It is the theory of appellee that one purpose of appellant's agents in publishing the libel was to hinder or prevent her from the sale of their machines, while she was not its agent. The libel itself when examined tends to corroborate or evidence this contention. Another purpose of the libel, as appellee contends, was to compel her to withdraw her second suit that she had

brought against the Company after July 19, 1906 There is some evidence tending to prove this contention. The facts out of which the alleged motives originated according to appellee's contention, are connected with the bringing of that suit or both suits, and the sales by her of the Singer sewing machines after she left the company, and the real substantial testimony of appellee properly begins with those occurrences for the purpose of proving motive and express malice. It is proper then for her to relate that she began the sale of Singer and Wheeler & Wilson machines on her own account, June 11, 1906, where she sold them, and from whom and how she obtained them, if she desires, without any considerable detail. Also to state what efforts Tatro and his authorized agents made to prevent her from selling them, and any expressions indicating malice, if any, in connection therewith. Also to merely state that she had those suits brought for damages, and against whom they were brought and about when, and that the second suit was pending June 4, 1907, if such be the facts. It may not be considered as improper to state that the first suit was settled or compromised by the parties, but it is not proper to state anything about how that compromise was reached, nor to state any of the conversations leading up to settlement, or to give in evidence the release or the terms of settlement, nor to state any matters concerning the merits of either suit or of the settlement. In this case, the jury is not concerned about the merits or demerits of those cases. If appellee has any right to maintain her said pending suit, or to avoid the settlement of the former suit, it will be time enough to hear the evidence bearing on those issues when they are legally before the court for investigation and settlement.

Mr. Cummings was a supervisor of appellant and as such had unquestioned authority to control the placing of sewing machines for sale. It also becomes a ques-

tion for the jury under the evidence whether or not Ta-
tro, or some other agent authorized by Mr. Tatro,
sent the libelous matter to The Tribune Company for
publication. Inasmuch as it is a question for the jury
whether or not Dorsey was such an authorized agent,
any general expressions of Dorsey, indicating malice
or ill feeling on his part toward appellee after the
bringing of the first suit, is proper, as well as any state-
ments he may have made to the effect that the Singer
machines in appellee's possession would be taken from
her. Any such expressions of Cummings or Tatro with
reference to removing them, or efforts to remove ma-
chines in her possession, after said suit was brought
would be proper, because they had authority to remove
them without question. The following expressions of
Mr. Cummings, found in Miss Gallagher's testimony,
and the circumstances under which they were made,
are proper, to-wit: "Those machines have got to be
removed. The only store that can sell in this district
is the store we are running at 1308 Wilson avenue, as
we have told you repeatedly." It is also proper for
her to state that Mr. Powers ceased to furnish her
machines in January, 1907, but improper to state that
he said he would be discharged if he furnished them,
etc., because hearsay evidence. Recitals of agents of
past facts not recited in the line of their employment,
and in furtherance of the principal's business, are not
binding on the company.

The following expressions of Dorsey, made after suit
brought and found in Miss Gallagher's evidence are
proper evidence: "I will have those machines taken
out." "Why don't you quit. The Company don't want
you and have placed you under me to get rid of you,"
spoken when she was working for him. Also, his ex-
pression, "Thank Heavens for that," when she told
him she had resigned. Also, any other general expres-
sions of Dorsey, indicating malice or ill feelings to-
wards her, after the first suit was brought. For like

reasons the second paragraph of Mr. Tatro's letter of July 27, 1906, in which he speaks of Mr. Jarrow being instructed not to furnish her machines, is proper evidence, and that the jury may understand his full meaning, the parts of her letter of July 19, 1906, enclosed in parentheses, and to which Tatro's was in reply, are admissible. None of the other parts of her said letter are admissible for various reason, that they are hearsay, mere conclusions of the witness, etc.

It is proper also for appellee to testify that in January, 1907, she went to Mr. Tatro's office and asked Mr. Roe in Mr. Tatro's presence why the Company stopped her from selling machines, and that he replied that she would have to go to her attorneys and withdraw her suit; that she told him Dorsey was going around still slandering her from house to house and that he told her if she would withdraw her suit, that they would have Dorsey cease it; that the Company was above the law, and that she could not make them observe it; that she then said, "Tell the Czar of Russia to come out and talk to me," and that then Tatro sent Mr. McClure out to talk to her and that Mr. McClure came out to her and said, "You take a friend's advice. This is the biggest corporation in the world. What can you do with them? When your case comes up they will put it back three or four years." These conversations were admissible, because they were in presence of Mr. Tatro and are to be considered the same as if had with Mr. Tatro direct, as her evidence tends to show they were speaking for him as the representative of the company.

The following statement of facts, appearing in her evidence, are proper, to-wit: That she had no enemies in Chicago to her knowledge and knew of no one having ill feelings toward her other than certain employees of appellant; the financial condition or wealth of appellant, and that she suffered mental anguish and could not sleep after she read the libel; that Cummings told

her she was blacklisted by the company, she having been sent to him by Mr. Tatro for employment after quitting work for Dorsey; that she could not get employment from other machine companies after the libel; and Tatro's expression to her, after reading from her letter of May 31, 1906, "How dare you to be so presumptuous as to interfere with the company's instructions to its manager, Mr. Dorsey? I will have you incarcerated in a lunatic asylum." Her reply thereto nor her letter that caused this expression to her are not proper evidence by her. She cannot make evidence for herself by self serving statements or letters. Appellant might, if it desired, introduce any part of her letter to show the provoking cause of Tatro's statement which is merely proper to prove malice on his part toward her.

It is not necessary or proper for her to give evidence to the effect that she was never discharged for forgery by the company, or that she never committed forgery, as the plea of not guilty alone is pleaded by appellant, and it admits that she never committed forgery. Sheahan v. Collins, 20 Ill. 326.

All the rest of her evidence, as above given, is entirely irrelevant and immaterial, and very improper and damaging to appellant, except the merely formal statements of her name, age and present employment, and the places where and the capacities in which she worked for appellant, and her acquaintance with the employees, etc., that are usual and merely introductory, and which should be given without any detail. Some of her evidence might become evidence for rebuttal testimony to contradict witnesses, etc., but we now simply consider it as original evidence, or evidence in chief for her.

For the purpose of proving malice on Dorsey's part, his inclination to slander appellee, and his knowledge of the published libel on the very day it was published, the testimony of Mrs. Maude White and Mrs. A. E.

Bennett were proper, as was also the testimony of Mrs. Etta Turney and Mrs. Morsbach, as above set forth, except those parts of their testimony enclosed in parentheses. Those witnesses detail additional incidents tending, when considered with all the other evidence, to show that the libel was published by Dorsey or Tatro or some other agent of appellant. The words used by Dorsey to these women are similar to, and some of them identical with, the words in the libel. It is true that the testimony of Mrs. White about the phone message to her, and of Mrs. Turney about Dorsey tapping the newspaper, considered singly and alone, would be very uncertain evidence and really barely admissible, because the voice who sent the telephone message, and the "newspaper tapped," were not identified; but when taken with all the other evidence we think they are proper for the consideration of the jury. It is not unusual that circumstances are of small or no significance in establishing facts when considered alone. The real question is have they any proving force when considered with the other evidence in the case? It is well established law that any fact may be proved by circumstantial evidence alone. With us now, it is not a question of the weight of the evidence, but as to its admissibility.

The remainder of the testimony for appellee, the bill of account for publishing the libel, and the testimony concerning it by Lambin, Annie Edgell and Frankie Grocox, were all competent.

It appears that this suit was brought June 11, 1907, and that the bill of The Tribune Company for printing the libel was repudiated by Mr. Tatro June 13, 1907, as unauthorized by him and his company. The time when Mr. Tatro received this bill for payment is, therefore, material. All those dates were material, as it was important to determine whether or not Mr. Tatro knew, on June 4, 1907, or within a day or two thereof, that the libel was published, and failed to repudiate the

bill, or to make a denial or retraction of the libel purporting to be published by himself for his company, until June 13, 1907, two days after suit brought.

It would seem to be unnecessary to undertake in detail to state the reasons why almost the entire bulk of the testimony of Miss Gallagher is held inadmissible. But we may say in general that the voluminous mass of details of her work and experiences with the company and her trials and troubles shed no light on this lawsuit. Much of it consists in self-serving declarations and writings of her own, and little petty, trivial occurrences between her and the employees of appellant, and the relation of other statements of appellant's witnesses that tended only to impeach and degrade them in an improper manner, and to so inflame the jury thereby with prejudice against appellant as to render them wholly unfit, if they needed the same, to consider this case on the merits. How can the details of the settlement of her first lawsuit, the release thereof, and how it was secured, and the contemptible things she testified that appellant's agent said they would do in that suit in the way of buying up the lawyers, judges, jurors, witnesses, reporters, etc., and what they said concerning the one-armed man in New Jersey, and how he died penniless lawing appellant for thirteen years without results, assist a jury in determining the question of appellant's guilt or innocence as to this charge of libel? Where a party to a lawsuit attempts to bribe or influence a witness to swear falsely, or undertakes to bribe a juror or other officer, or threatens to do so for the purpose of defeating the other party to the suit, it is always competent to prove such acts in the trial of that case. Such evidence would tend to prove that such party's defense or claim was not well founded, but false and fictitious, because, if his claim or defense was honest and bona fide, he would have no occasion to resort to such fraud. But no court, we apprehend, has ever held that such evidence would

be admissible in every other lawsuit that party might have, not in any way connected with the lawsuit in which the fraudulent methods were used. Judgments in convictions of infamous offenses for the purposes of discrediting witnesses are admissible, but the evidentiary facts alone leading to such convictions are not even admissible in other suits to discredit witnesses.

We can not, without extending unnecessarily this opinion, detail all the reasons for holding that the portions of appellee's evidence above designated were competent. We will simply state the principles of law governing the same and then the reason ought to appear for each ruling. We have already referred to the subjects of malice and motive. It is always proper to introduce repetitions of a slander or libel to prove malice, and to introduce general expressions of the defendant denoting malice. Wigmore on Evidence, vol. 1, sec. 404; Newell on Defamation, Slander and Libel, pp. 332, 336; Gaines v. Gaines, 109 Ill. App. 226.

Mr. Tatro, Mr. Cummings and Mr. Dorsey, as agents of appellant, are shown by the said admissible portions of appellee's evidence, if the same be true, to have all been endeavoring on behalf of appellant to prevent appellee from selling Singer sewing machines, while not appellant's agent between the dates of June 11, 1906, and June 4, 1907, and later. Mr. Tatro and Mr. Cummings are shown by the evidence to have authority from appellant to control the placing with its agents its sewing machines, that is to say, they could place them where they thought best, and they also had the right and power and it was their duty to see that agents selling their machines sold them according to their system of selling, and to see that no one sold them who was not duly authorized by contract and by bond, etc. Hence they had the authority to prevent their agents from placing any of their machines with appellee for sale when not under contract and bond to sell and account, and their authority would certainly extend to

the prevention of sales by her of any machines in their agency or in possession of any of their agents. Appellee's evidence tends to show that Dorsey was working with them in this same line; that is, in preventing and hindering appellee in the sale of appellant's machines. We think it was a question for the jury to say whether or not Mr. Tatro knew that Dorsey was doing that, and ratified or approved or authorized Dorsey's acts in that regard. Some of Dorsey's acts and statements seem also to have been done in the line of his duty or within the scope of his employment as a collector for appellant. His telephone messages to Maude White, if he sent those messages, with reference to Mrs. Hengishe's machine, are of that character. If any one of those three agents, or any other agent, was authorized to hinder or prevent appellee from selling its machines, then any act done in that line of employment by them or any one of them for the purpose of accomplishing that purpose, or by Dorsey for the purpose of collecting for a machine or for its repair, and which act or acts were reasonable and apt to accomplish the same, would be binding on appellant, because done within the scope of their employment. Advertising in a newspaper by way of notice to the public that appellee was not authorized to sell its machines, and that it would not be responsible by reason of such sales, would be a reasonable, a usual and an apt way of hindering her sales, as it would tend to induce the public not to trade with her and accept the company's guaranties given by her. Therefore, if any agent authorized by appellant to stop or hinder her from selling its machines, gave The Tribune the said libelous matter for publication to effect that purpose, his act would bind the company, although forbidden by it in general terms not to advertise. The rule of law is stated clearly in the case of Pennsylvania Iron Works Co. v. Henry Voght Mach. Co., 29 Ky. Law Rep. 861, in which the court said:

"A corporation is liable in damages for the publication of a libel, as it is for other torts. To establish its liability, the publication must be shown to have been made by its authority, or to have been ratified by it, or to have been made by one of its servants or agents in the scope of his employment, and in the course of business in which it is employed. * * * The evidence shows very clearly that Wilson was the duly authorized agent for appellant and in charge of its southern office at the time he wrote the letter. That it was written in the course of his business for appellant and was within the scope of his employment is made plain by the fact that it was written for the purpose of obtaining for the appellant the contract to build the ice machine for the Northern Lake Ice Company and to take this business away from appellee. * * * It may be true that appellant did not authorize Wilson to insert in this letter the libelous statements it contained, and it may be conceded that they were written without its knowledge or consent, but this will not exonerate it from liability for the wrong perpetrated by him in an effort to obtain business for it."

Story on Agency (9th Ed.) sec. 452, states the rule as follows:

"In the next place, as to the liability of the principal, to third persons, for misfeasances, negligences, and torts of his agent. It is a general rule of law, that, although the principal is not ordinarily liable (for he sometimes is) in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in those acts or misdeeds, yet, he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligence, and other malfeasances, or misfeasances and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them."

See also New York Cent. & H. R. R. Co. v. U. S., 212 U. S. 481; Hypes v. Southern Ry. Co., 82 S. C. 315; Chicago City Ry. Co. v. McMahon, 103 Ill. 485; Metropolitan Life Ins. Co. v. People, 209 Ill. 42.

Such liability "extends not only to the injuries and wrongs of the agent who is immediately employed by the principal in a particular business, but also to the injuries and wrongs done by others, who are employed by that agent under him, or with whom he contracts for the performance of the business; for the liability reaches through all stages of the service." Story on Agency, sec. 454; Wilson v. Noonan, 27 Wis. 598.

"While the term 'course of employment' is impossible of precise definition, it may be said broadly that the act of the agent is within the course of his employment when the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose." 31 Cyc. 1585.

"General authority to accomplish a given end includes the use of all means 'reasonably intended and directed to that end,' and as to other parties affected thereby, the principal cannot limit them by express orders to the agent." Springfield Engine and Threshing Co. v. Green, 25 Ill. App. 106.

Appellant insists that the act of appellant's agents in publishing the libel, if they did so, is a wilful departure from their employment and from appellant's business, as their contracts by general language prohibit them from advertising. We think, if they did so, that the act may be characterized as a wilful act done by the agent in furtherance of appellant's business. If the act was done within the scope of the agent's employment, to stop appellee from selling its machines, for instance, it would bind appellant. In Wood v. Williams, 142 Ill. 269, our Supreme Court lays down the rule:

"That the master is not liable for the wilful or malicious torts of the servants unless they are in furtherance of the master's business, or are subsequently ratified by him."

To be more definite on one point, we might further say that the evidence of appellee to the effect that she

was instructed orally by Mr. Tatro to advertise for help, when she needed help, to break down competition, etc., are improper as evidence, because they do not tend to prove that Dorsey or any other agent other than appellee was so instructed. Neither would oral instructions to advertise for help, authorize advertising for the purpose of stopping a party from selling machines or from assumming the role of an agent of appellant. It was not competition by Miss Gallagher they sought to avoid or break down, but they simply sought, according to her own evidence, to prevent appellee from selling Singer machines, or such machines as appellant had control of, unless she qualified and sold the machines as appellant's agent. Her statements to Mr. Tatro in her letter of July 19, 1906, informing Mr. Tatro that his agents were slandering her would be proper if she named the agents doing so, provided the slanderous words had been any portion of, or similar to those in the libel. This would be so on the ground that Mr. Tatro, according to her testimony, subsequently heard and apparently ratified the statements of his agents to the effect that Tatro or the company would stop Dorsey from slandering her, if she would withdraw her suit. In that instance Mr. Tatro apparently approved of Dorsey's misconduct, whatever it might be, as a further means of coercing her, as she claims, to withdraw her suit and is admissible evidence upon that ground. Were it also shown that Tatro knew Dorsey was repeating or using the language in the libel to prevent her from selling machines, or to aid Dorsey in collecting for repairing a machine, and that Tatro refused to have Dorsey cease only on condition of her withdrawing her suit or stopping the selling of machines, it would be also evidence of his ratification or authorizing such conduct of Dorsey. Mere declarations to him of her conclusions that Dorsey was slandering her, however, do not tend to prove that he knew of his using any such slanderous words as are found in the libel.

Some of the evidentiary facts found in the testimony of appellee that tend to show the guilt of appellant, and to make a case for the consideration of the jury, are the following:

1. The libel on its face was an advertisement for the benefit of appellant, and in furtherance of the particular business in which, appellee contends, Mr. Tatro, Mr. Cummings and Mr. Dorsey were all engaged, the prevention of the sale of any machines in their charge, except by duly qualified agents of appellant, and particularly such sales by Miss Gallagher.

2. The libel was not written or furnished by a reporter nor by any one connected with the newspaper.

3. That it was furnished to The Tribune by some one by means of the telephone purporting to do so by authority of appellant and from the office of appellant.

4. That a bill for the advertisement was mailed to appellant some two to four days after the day of the publication of the libel, and was not repudiated until nine days thereafter by Mr. Tatro, and after this suit was brought, although it had appeared in the paper, as authorized by appellant and by "M. M. Patro," a name for which his own name, M. M. Tatro, when spoken in the phone or written with a pen, might be mistaken or misprinted by the printer.

5. That exactly the same or similar false statements contained in the libel were spoken by Mr. Dorsey on different occasions for a year or more prior to the publishing of the libel.

6. The tapping of the newspaper by Dorsey on the very day of the publication of the libel and the statements made by Mr. Dorsey at the time, and the telephone communications with Maude White on the day of the publicaiton of the libel and three days thereafter.

7. That appellee had no enemies in Chicago, except certain employees of appellant.

See Haney Mfg. Co. v. Perkins, 78 Mich. 1; Bent & Cottrel v. Mink, 46 Iowa, 576; Pennsylvania Iron

Works Co. v. Henry Voght Mach. Co., *supra;* Fogg v. Boston & L. R. Corp., 148 Mass. 513.

It is contended by appellant that the verdict of the jury is so manifestly against the weight of the evidence that the cause should be reversed without remanding. It is true that the phone message to Miss Murray and all knowledge thereof is denied by Mr. Tatro and by all his employees, male and female, that were at his office on June 3, 1907, that almost all of the testimony of appellee herself, material and otherwise, and of all her witnesses is denied very positively by the witnesses for appellant; yet, we think the evidence should be considered by the jury and we have determined to reverse the judgment and to remand the cause for a fair and impartial trial on the merits, and to only pass upon such questions as are presented to us on this appeal, as may again arise on the next trial. We do not, therefore, deem it proper to discuss the evidence upon its merits further than to say that it is so close and the right of recovery so doubtful upon a consideration of the proper and relevant evidence in the case that it is not possible to affirm the judgment with all the errors in the record that are indicated in this opinion. We do not think it possible for any jury to fairly and impartially render a verdict in this case on the merits, under the holding of the court that they should consider, as proper evidence, all that mass of irrelevant and imflammable matter detailed to them, as above indicated, and which is entirely foreign to any issue in the case.

The complaints of appellant that counsel for appellee were unfair in their manner of examining witnesses and in presenting the evidence generally are well founded in almost every particular pointed out by them in their argument. One instance out of many will serve to show the nature of this unfairness. In cross-examining Mr. Tatro about the settlement of the first law suit, an entirely irrelevant matter, occurs the following:

"Q. You did not know that she had an attorney?"

On objection by appellant's counsel, counsel for appellee said, "I insist it is a breach of confidence of the worst sort for any person to take a little woman who has a suit pending in court and make a settlement behind her attorney, that is what I insist."

The court ruled that the remarks were to be disregarded by the jury then, but allowed the evidence to go to the jury, merely remarking, "The argument of counsel at this time may be desregarded by the jury." The purpose of such remarks are evident. There is no excuse for them. We cannot in many instances determine the effect of such unfairness where the verdict is in favor of the party for whom it is used. But we can and will deprive the party of the probable fruits of such unfairness, whenever there is any substantial doubt as to its influence upon the jury, by reversing the judgment and remanding the cause for another trial.

As to the instructions, we do not think the objections of appellant to appellee's instructions numbered 3 and 4 are well taken. Appellee's instruction No. 11 should not have been given at all. It is but an argument as to what the jury should do when four or five witnesses testify against one upon certain points of evidence which applied particularly in this case to Miss Gallagher's evidence, which in many instances was contradicted by four or five or more witnesses for appellant. It was unfair to appellant, and the first sentence was misleading and erroneous, to-wit: "By a preponderance of proof the court does not mean a larger number of witnesses on a given point." The word, necessarily, is omitted from that sentence before the word, "mean," and in view of what is said following that sentence the jury were likely to be led into the belief that the number of witnesses for or against a proposition had nothing to do with determining the preponderance of the evidence upon any question. Instruction No. 7 is objectionable for the same reason that it

omits the word, necessarily, from the same character of sentence above quoted. No. 5 is an instruction on the measure of damages and closes with this statement, that on the question of damages the jury can consider, "the whole conduct of the defendant, so far as it is shown by the evidence respecting the plaintiff, both before and after the bringing of this suit and during the trial, and all the other facts and circumstances as shown by the evidence in this case." That is about as indefinite language as it is possible to use. If proper to give such an instruction, the rule of pointing out the specific elements to be considered by the jury in such an instruction in assessing damages by the jury has no meaning. The court might as well say to them, "Consider all the evidence in the case, that that does, as well as that that does not, have any reference or bearing on the question of damages." For the reason indicated, that the court should state particularly the proper elements to consider in assessing damages, the instruction is erroneous; and also for the further reason that if the defendant was at the trial, it was there by agents and attorneys, and the jury are left without guide as to what agents and what acts the jury should consider of the host of witnesses examined for defendant, most all agents of one kind or another of defendant, and also leaves the jury to guess as to whether or not the court also included its attorneys and their acts on the trial as a subject for consideration in assessing damages. No misconduct of any agent or attorney at the trial is evidenced in this record, and if there was any such evidence bearing on the question of damages, we ought to know what it is, so we can pass on it. If there is no such evidence, the instruction as to that point is not based on evidence and is misleading.

For the reasons already indicated the court properly refused appellant's instruction No. 8. The court also properly modified appellant's instruction No. 28. A court can not legally tell a jury that a contrary state-

ment out of court to what a witness testified in court "tends to discredit him." That is a question for the jury and depends with them necessarily upon whether the evidence is material and whether or not the difference in his testimony is accidental, because of a slip in memory, or intentional and for corrupt purposes.

For the errors indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*