Nestor Johnson Manufacturing Company, Appellee, v. Morris Goldblatt et al., Appellants.

Gen. No. 35,124.

Heard in the second division of this court for the first district at the April term, 1931. Opinion filed February 23, 1932. Rehearing denied March 5, 1932.

PRITZKER & PRITZKER, for appellants. Morris Goldblatt and Nathan Goldblatt; ARTHUR J. GOLDBERG and REUBEN L. FREEMAN, of counsel.

CHARLES A. BROWN and HARVEY L. HANSON, for appellant F. W. Planert & Sons, Inc.

ZANE, MORSE & NORMAN, for appellee; JOHN M. ZANE, HAROLD W. NORMAN and CRAIG R. JOHNSON, of counsel.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

By this appeal Morris Goldblatt and Nathan Goldblatt, doing business as Goldblatt Bros. (hereinafter called the Goldblatts), and F. W. Planert & Sons, Inc., an Illinois corporation (hereinafter called the Planert Co.), seek to reverse a decree of the superior court of Cook county, entered January 22, 1931, wherein it is adjudged that said defendants, and their respective officers, employees, agents, etc., and all other persons acting through or under them and each of them, be perpetually enjoined and restrained "from carrying on any *scheme* of unfair competition with the complainant or from advertising for sale or representing for sale or offering for sale or selling tubular ice skates of Nestor Johnson Manufacturing Co. in juxtaposition with advertisements of or displays of Planert skates below the regular retail selling price of Johnson skates in the sum of $6.85, or of advertising the skates of Nestor Johnson Manufacturing Co. in juxtaposition with advertising matter in regard to the tubular ice skates of F. W. Planert & Sons, Inc., or

with Planert skates where the skates of Nestor Johnson Manufacturing Co. are advertised for sale at any price below that of F. W. Planert & Sons, Inc., or at less than $6.85 per pair, or from any further carrying out of the *scheme and agreement* between Goldblatt Bros. and F. W. Planert & Sons, Inc., complained of in the bill of complaint, or any similar agreement, or from further representing, either directly or indirectly, by advertising or displays or in any other way, the skates of Nestor Johnson Manufacturing Co. to be of inferior character to those skates called Planert skates.''

In the decree, after providing for the payment of certain sums allowed as costs, the court ordered that a certain previous order to show cause in a contempt proceeding ''be dismissed by agreement of the parties.''

Complainant's verified bill was filed on December 19, 1927. It prayed that a temporary injunction be issued, enjoining the defendants, their agents, etc., ''from advertising for sale, or offering for sale, or representing for sale, or selling, tubular ice skates of complainant below the regular retail selling price of such skates in the sum of $6.85 per pair, or of advertising the skates of complainant in juxtaposition with advertising made in regard to the tubular ice skates of Planert & Sons, Inc., or of Planert skates, where the skates of complainant are advertised for sale at any price below that of said Planert & Sons, or at less than $6.85 per pair, or from any further carrying out *of the conspiracy* complained of in the bill of complaint herein, or from further representing, either directly or indirectly, the skates of complainant to be of inferior character to those skates called Planert skates''; and that upon final hearing the injunction be made perpetual, etc. On the same day, without notice, the court issued the temporary injunction as prayed for, and on December 22, all defendants having entered appearances, the

court, on motion of the Goldblatts to dissolve the injunction on the face of the bill, dissolved it. On December 23, 1927, complainant, following the practice as sanctioned in *Williams v. Chicago Exhibition Co.,* 188 Ill. 19, 26, moved that its bill be dismissed and that it be allowed to appeal to this court from the order of dismissal. The motions were granted and the appeal was perfected here.

On November 27, 1928, this court adjudged that the judgment of the superior court, dismissing complainant's bill, be reversed, and that the cause be remanded to the superior court "with directions that it enter a rule upon the defendants to plead to or answer the bill, as they severally may be advised, and for a hearing upon the merits." (*Nestor Johnson Mfg. Co. v. Goldblatt,* 250 Ill. App. 644.) In the opinion (not published) we said: "The sole question for our determination is whether the facts, *as alleged in the bill,* warranted equitable relief by injunction as prayed for. Defendants' motion to dissolve operated as a demurrer to the bill and admitted the truth of the facts therein properly pleaded, as distinguished from conclusions or inferences of law." After setting forth the material allegations of the bill and describing four advertisements, which appeared in Chicago newspapers on different days during the month of December, 1927 (copies of which advertisements were set out in the bill), we further said:

"After examining the allegations of complainant's bill, and considering the briefs and arguments of opposing counsel, and reviewing many adjudicated cases, we have reached the conclusion that the bill *states* such facts as require, under the decided current of authority of the courts of this and other States and of the United States, that defendants plead to or answer the bill and that a hearing upon the merits be had. We think that the bill sufficiently discloses prima facie that defendants wilfully and maliciously sought, and

at the time of the filing of the bill still were seeking, to injure complainant in its trade and business, thereby causing it irreparable damage, and that defendants wilfully and maliciously *conspired* together to that end, and, when the acts as alleged were committed in consummation of the conspiracy, had no legitimate purpose of their own to serve. (Citing cases.) And we think that the bill sufficiently discloses prima facie a case of *conspiracy* on the part of defendants to unlawfully and maliciously carry out a scheme of unfair competition, remediable by injunction. (Citing cases.)''

After the mandate of this court had been filed, the superior court, on December 20, 1928, reinstated the cause and also the temporary injunction against defendants. After answers to the bill, and replications to the answers, had been filed, the court on January 7, 1929, referred the cause to a master, before whom a mass of oral and documentary evidence was introduced. He made his report on June 6, 1930, in which after making numerous findings, he concluded that ''complainant *has failed to prove* the material allegations contained in the bill,'' and that ''the equities of the cause are with the defendants.'' He recommended that the bill ''be dismissed for want of equity,'' and further found:

''20. That *no conspiracy* between said Goldblatt Bros. and defendant Planert has been proven; that Goldblatt Bros. procured said Johnson skates through regular business channels; that there was no agreement between Goldblatt Bros. or anyone through whom said skates were purchased to sell the same at any particular price; and that the preponderance of the evidence discloses that said advertisements and acts of Goldblatt Bros. and defendant Planert were not done for the wilful and malicious purpose of injuring the business of complainant, but were done for the

lawful purpose of legitimately increasing the sales of said Goldblatt Bros. and defendant Planert.''

Complainant filed numerous objections to the report but the same were overruled by the master, whose report was filed on October 17, 1930. On the hearing before the court the objections stood as exceptions.

On December 16, 1929, while the cause was pending before the master, complainant filed a petition praying for a rule on the Goldblatts to show cause why they should not be adjudged in contempt of court for violating the temporary injunction then in force, by reason of their publication of three other advertisements in a Chicago newspaper during December, 1929. Copies of the advertisements were attached as exhibits to the petition. After the court had entered the rule, the defendants filed an answer to the petition. Inasmuch as it appears from the decree, as above mentioned, that the contempt proceedings ''by agreement of the parties'' were dismissed, we deem it unnecessary to further consider said proceedings or said advertisements.

In the decree the court made numerous findings in substantial accord with the allegations of the bill. Many of them are contrary to those of the master. Among the court's findings are:

''8. In the months of October and November, 1927, complainant received over the telephone requests from *someone* purporting to speak from the Goldblatts' store asking for sales of Johnson skates *directly* to Goldblatt Bros. from complainant, but it was explained by complainant what its method of business was and such sales were declined by complainant, and thereupon *the person* soliciting such sales *threatened* complainant for such refusal; that thereafter said Goldblatt Bros. and said Planert Co. formed the design of carrying on a *scheme of unfair competition* with and of injuring the business of complainant . . . .

"11. That the various acts above stated were done by the defendants *not* for any *lawful or legitimate purpose* of said Goldblatts or said Planert Co., or either of them, but for carrying on *an unfair competition* with complainant and for the unlawful purpose of appropriating the good will and reputation of said complainant and injuring its business and the good name and value of Johnson tubular ice skates. . . .

"13. That the material allegations in the bill of complaint have been substantially proved, and that complainant is entitled by reason thereof to a permanent injunction, enjoining the Goldblatts and the Planert Co., and the agents, officers, employees and successors and assigns of each of them, as prayed in the bill."

Inasmuch as defendants' main ground for a reversal of the decree is that (as found by the master) the evidence failed to prove any conspiracy on the part of the Goldblatts and the Planert Co. to injure complainant in its trade and business, as alleged, we here set forth the material allegations of the bill, in which it is first alleged in substance:

That complainant is an Illinois corporation with principal place of business in Chicago; that the Goldblatts are copartners, as Goldblatt Bros., in conducting a department store in Chicago; that the Planert Co. is an Illinois corporation having its principal place of business in Chicago; that complainant and Planert Co. are competitors in business in Chicago, the United States and elsewhere, in manufacturing and selling skates of the same general design and description, known as "tubular ice skates"; that complainant's skates are known to the trade as "Johnson" skates, one of the models of which being called "Flyers"; that complainant's skates have been widely advertised and have had a high reputation; that its business in manufacturing and selling them has been large and lucrative; that the Planert Co. sell and have sold tu-

bular ice skates, known as "Planert's" skates, and of which a certain model is called "Winners"; that the Planert skates have a general resemblance to those of complainant; that the Goldblatts, as a part of their *retail* business in said department store, have sold and are selling tubular ice skates; that complainant "has conducted its business of selling its skates in Chicago through jobbers or wholesalers, and has *not,* as a matter of reasonable and deliberately adopted method of business, sold its skates in Chicago *directly* to the *retail* trade, *excepting* large dealers whose purchases are equal to those of a jobber"; and that complainant "has consistently maintained the wholesale selling price of its model of 'Flyers' and thereby has maintained a general high selling price at retail of said 'Flyers' of $4.50 per pair to its distributors and jobbers and $6.85 up to $7.50 per pair to the retail trade."

The above allegations are sustained by the evidence introduced before the master, *excepting* those allegations in the last two clauses. It appears in substance from the testimony of complainant's general manager, C. I. Johnson, that complainant, prior to December, 1927, sold Johnson skates directly to a large number of retail merchants in Chicago, including The Fair, Stebbins Hardware Company, Von Lengerke & Antoine, Wieboldt's, Sears Roebuck & Co. and Fair Play Co.; and also "to about 25 to 50 retailers in the State of Illinois"; and also "to approximately 100 exclusive retailers in the United States, scattered from coast to coast." It also appears from Johnson's testimony that complainant sold many skates to Sears Roebuck & Co. at a net price, including discounts, of *$4.27–½ per pair.* The bill further alleges:

"8. That *the Goldblatts,* being *incensed* against complainant on account of the fact that it as a manufacturer disposed of its product to jobbers and large dealers, and that it did not think it good business policy to sell its skates directly to the Goldblatts as retailers

and had so informed them, maliciously and unlawfully *conspired with the Planert Co.* to injure the business and good will of complainant, and the *Planert Co.* maliciously and unlawfully *conspired with the Goldblatts* to carry on *an unfair competition* with complainant, and to market its skates instead of Johnson skates asked for by customers, *and agreed* to publish the advertisements hereinafter set forth, and other advertisements of that character, *and to cause* the Goldblatts to advertise for sale and to sell complainant's tubular ice skates *at a price less than cost,* and to keep on hand *a few* of said Johnson skates, not enough in quantity to justify the advertising thereof, and, when exhausted, *to offer Planert skates to customers instead of Johnson skates,* and, by means of said advertisements and such prices, *to represent* the skates of complainant *to be of inferior quality* as compared with the skates of the Planert Co., *and to cause* the various retailers dealing in tubular skates *to decline to deal in and to carry* complainant's tubular skates *and to cause* it to be understood in the trade that complainant was *cutting the price* of its skates through sales by the Goldblatts, *and to destroy* complainant's business and sales, *and to cause* retail dealers to cancel orders for complainant's tubular skates; and *did further agree to divide* between the Planert Co. and the Goldblatts the cost of said advertising''; and ''in pursuance of said conspiracy, did on December 4, 1927, publish and caused to be published, either at their joint cost or at the cost of the Planert Co., in the Chicago Herald and Examiner, a Chicago newspaper having a wide circulation, the following advertisements:''

The advertisement of December 4, 1927, is set out in full in the bill by newspaper copy, and in our former opinion we described it as follows:

''At the top is the name in large letters of 'Goldblatt Bros. Dept. Store' and the location of the store at

'1609–35 W. Chicago Ave., near Ashland.' Then appears a heading in large letters 'Genuine Planert Skates' in the center of the sheet. Underneath this heading, and to the left, is a cut of a high laced shoe, attached underneath to a tubular skate, and the words, 'The World's Best Skate,' and also a figure of a boy skating and a dog running along beside him, and the words, 'I'm as fast as you are now, Speed.' Underneath said heading, but to the right, are the words, in heavy black type, 'Planert's All Steel, Full Tubular Ice Skates.' Then follow the sentences, in small type: 'Winner' Model, for racing, hockey, figure and pleasure skating. Electrically welded. No open seams. Shoes of selected leather. Nationally advertised and guaranteed by the manufacturer. On sale, a pair ......' Still further to the right are the figures, in very large black type, '$6.95.' Underneath said sentences are the words: 'Free; a pair of pure all-wool skating hose with every pair.' Immediately to the left of the figure of the boy and dog, and separated therefrom by a broad line, is another cut of a high laced shoe, attached underneath to a tubular skate. Above this cut are the words 'Nestor Johnson Skates.' The word 'skates' is of larger and blacker type than the words 'Nestor Johnson.' Below this cut are the sentences, in small type: 'The well-known Nestor Johnson Skates, Hockey or Racers for women or men. Famous Flyer brand. All sizes, a pair ......' Immediately to the right of the sentences are the figures, in large black type, '$4.98.' "

The bill further alleges (par. 8) that by reason of said advertisement defendants "did cause it to be understood that complainant was selling its skates to a particular dealer at a large discount, and was enabling the Goldblatt Bros. to sell its skates at a lower price than they could be purchased by any other dealer, *and sold at less than cost* in the retail trade, and did

*impliedly represent* said tubular skates of complainant to be, in the public understanding, inferior to said Planert skates; and that the public did understand that complainant's skates were inferior to said Planert skates.'' The bill further alleges in substance:

9. That ''pursuant to said conspiracy'' the Goldblatts, having on hand a ''few pairs'' of Johnson skates, sold at the price advertised the Johnson tubular skates which they had on hand, and then offered for sale, to customers asking for Johnson skates, Planert skates ''at the same cut price''; and that said price of $4.98 ''was below the price at which *any retailer* could acquire Johnson skates.''

10. That the Goldblatts, ''having thus sacrificed its *small number* of Johnson skates,'' attempted to obtain additional skates ''to further carry on said conspiracy,'' but was unable to obtain any more of complainant's skates at a price below $5.50 per pair; that, thereupon, ''having obtained *about 75 pairs* of complainant's skates,'' and ''being thus equipped to further carry on said conspiracy,'' they, on December 9, 1927, published in the Chicago Daily News, a newspaper having a wide circulation in Chicago, another advertisement (set out in full, in which the Johnson skates, ''Flyer Brand,'' are advertised for sale by the Goldblatts at the ''sensationally low price of $5.48 per pair,'' and the Planert skates, ''Winner Model,'' are advertised at the price of ''$6.95 per pair,'' and that with each pair purchased there would be given to a purchaser ''free, a $1.00 set of scabbard guards''); that said advertised price of the Johnson skates ''was below the cost price of said skates''; that said advertisement ''was of the same character and calculated to produce the same effect as the preceding advertisement''; that thereupon the Goldblatts ''sold its *few pairs* of Johnson skates at said advertised price of $5.48 per pair,'' and thereupon ''offered Planert skates to customers asking for Johnson skates at $5.48

per pair''; that thereafter on December 14, 1927, the Goldblatts, ''in furtherance of said conspiracy,'' advertised Johnson skates ''at the price of $5.44 per pair'' in said Chicago Daily News (this third advertisement is set out in full in the bill and is also of the same general character,—the Planert skates being advertised at said price of $6.95 per pair); that thereafter on December 16, 1927, the Goldblatts, ''in pursuance of the same conspiracy,'' published in said Chicago Daily News a fourth advertisement (also set out in full in the bill, and in which the Johnson skates are advertised at ''$5.39 per pair'' and the Planert skates, ''The World's Best Ice Skates,'' at ''$6.95 per pair,'' and under the heading ''Nestor Johnson Skates'' are the words *''Another Big Shipment* Received for Tomorrow''); and that ''such acts and said advertisements were done solely for the malicious and unlawful purpose of injuring complainant's business and the good name and value of its tubular skates, and not to advance any legitimate purpose of the Goldblatts.''

11. That said conspiracy and said publications, and the aforesaid acts of the defendants, the Goldblatts and the Planert Co., were done by them and each of them, not for the lawful and legitimate advancement of the business of the Goldblatts or for any lawful or legitimate purpose, but ''solely for the wilful and malicious purpose of injuring complainant's business, and of bringing its tubular skates into disrepute, and of drawing away its customers for said skates''; that ''by the conspiracy and acts aforesaid complainant's business has been greatly injured'' and ''it has been exposed to damages which cannot be measured in money and are irreparable in their nature''; and that said acts of defendants ''are and constitute a continuing wrong and injury, irreparable in its nature and which can be redressed only in a court of equity.''

As to the finding of the court (par. 8 of the decree as above) relative to some person telephoning complainant several times during the months of October and November, 1927, and requesting complainant to sell its skates direct to the Goldblatts, and which person after the refusal of the requests *threatened* complainant, etc., complainant's counsel here urge that the finding discloses a motive on the part of the Goldblatts to enter into the conspiracy as charged. The only evidence, however, to support the finding is the testimony of complainant's general manager, C. I. Johnson. He testified on direct examination: "I had telephone conversations in September and October, 1927, three of them,—the first in September and the other two before November 1st. In the first conversation they said, 'This is Goldblatt,' and that they were interested in skates. I told them, as I had other people, that we sold through distributors. . . . I explained our method of doing business, and said we had certain jobbing arrangements that we had to maintain, selling to the wholesaler, and that we were not in a position to sell to them direct. . . . The second conversation was about the same as the first. The third conversation started about the same as the first. This man from Goldblatts said that they were going to purchase the *Alfred* Johnson skates, and I told him . . . that it was his privilege to buy where he wanted and our privilege to sell where we wanted, but that he should be careful not to advertise them as 'Johnson' skates, and then he went on and *made a threat.* He said: 'Well, *we will fix you for that.*'" On cross-examination the witness testified: "I had never heard the voice over the telephone before, and *probably would not now recognize it.* . . . In the third conversation I recognized the voice as that of the same man I had talked to previously. He told me he was from Goldblatts. *I have never made any inquiries to find out who he was.*" We do not think that this testimony

as to the claimed telephone conversations was competent or that it can be held to support the above mentioned finding. (*Rueckheim Bros. & Eckstein v. Ser Vis Ice Cream & Candy Co.,* 146 Ill. App. 607, 609, 610; *Pumphrey v. Giggey,* 150 Ill. App. 473, 476; *Gallagher v. Singer Sewing Mach. Co.,* 177 Ill. App. 198, 226; 71 A. L. R., note, p. 10 *et seq.*) Furthermore the master, having allowed this testimony in evidence as well as contradictory testimony of both Goldblatts and their agents in positions of authority, made the further finding that the preponderance of the evidence discloses that "no attempt was ever made by Goldblatt Bros. to purchase any skates directly from complainant." And the uncontradicted evidence further discloses that the Goldblatts made their purchases of complainant's skates from Butler Brothers and Marshall Field & Co., who were distributors of complainant's skates in Chicago. And there is no sufficient evidence connecting the Planert Co. with said claimed threat.

As to the allegations (contained in par. 8 of the bill as above) that the Goldblatts conspired with the Planert Co., and the latter with the former, to do the acts mentioned, we do not think that such conspiracy is sufficiently proved by the evidence. What is said in *Tribune Co. v. Thompson,* 342 Ill. 503, 529, is here applicable: "It first must be noted that the burden of proof is upon the complainant to prove the appellants guilty of conspiracy, as charged in the bill of complaint, by clear and convincing evidence. . . . There is no direct evidence in this case to prove the conspiracy, and while conspiracy may be proved by indirect or circumstantial evidence such evidence must be clear and convincing, and if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved. . . ."

As to the acts alleged to have been done by the Goldblatts "pursuant to said conspiracy," and the purpose

of them (set forth in paragraphs 9 and 10 of the bill as above), we do not think that the same were sufficiently proved by the evidence, except as to the drafting and publication of said advertisements by the Goldblatts *alone*. On the contrary we think that the following further findings of the master, as well as his finding No. 20 above mentioned, are in substantial accord with the evidence:

"10. That the business of the defendant Planert was originally started by F. W. Planert in the year 1900 when said Planert made a pair of skates for one of his sons; that he started to manufacture skates on a very small scale and that said business continued to grow; that in 1927 said defendant corporation sold about 75,000 pairs of skates. The present corporation of F. W. Planert & Sons, Inc., was organized in October, 1925.

"11. That the complainant and the defendant (Planert Co.) *both* claim that the tubular skates manufactured by them are superior to all other skates and each claims that its skates are superior to the skates of the other. The master further finds that the skates manufactured by the complainant and said defendant *are of the same general character* and differ only in certain details.

"12. That said Goldblatt Bros. purchased *between 900 and 1,000 pairs* of said Johnson 'Flyers' skates during the season 1927–28 from Butler Brothers, and Marshall Field & Co., Chicago; they also had about 40 or 50 pairs of said skates left over from the preceding season, 1926–1927; that Marshall Field & Co. made three shipments consisting of 313 pairs of 'Johnson Flyers' Skates as follows: One shipment of 213 pairs, another shipment of 3 pairs, and another shipment of 97 pairs. On December 9 and December 15, 1927, said Butler Bros. shipped to Goldblatt Bros. a total of *600 pairs* of said skates.

"14. That defendant Planert solicited orders for skates from said Goldblatt Bros. on many occasions in the years 1926 and 1927 through one Brodack, a salesman in its employ. That the first order was given to said Brodack in November, 1927, for 100 pairs of 'Winners' which were to be shipped on consignment at $4.50 per pair; 119 pairs were actually shipped, consisting of two types of 'Winner' model and 'Northlight' model. At that time defendant Planert allowed said Goldblatt Bros. the sum of $100 for advertising purposes. The request for the allowance was made by Goldblatt Bros., prior to the placing of their first order. The practice of making cash allowances for advertising was generally followed among the trade.

"15. That after the shipment of said 119 pairs of skates, further orders were received by defendant Planert from Goldblatt Bros. and during the season 1927–1928, about 1,000 pairs of said skates were sold to said Goldblatt Bros. The price paid by Goldblatt Bros. for said first shipment of 119 pairs on consignment was at the rate of *$4.50 per pair, less cash discount* of two per cent in 10 days and net 30 days.

"19. That one Lucy Baxter purchased a pair of Johnson skates at Wieboldt's store in Chicago, in December, 1927, for $6.85; that a day or two thereafter she saw the advertisement of Goldblatt Bros. in one of the newspapers, advertising the sale of Johnson skates; that she returned the skates so purchased by her to Wieboldt's store and came to the Goldblatt's store to select a pair of Johnson skates at the advertised price; that she was informed by one of the salesmen in Goldblatt's store that the size she desired was not in stock, but that *they would order same;* that she was also told that Planert skates were better than Johnson skates; and that she finally purchased the Planert skates."

The witness Baxter was called by complainant. Her testimony further discloses in substance that said

salesman explained to her at the time certain points of superiority of the Planert over the Johnson skates which, upon comparing the two models, she believed to be true; that the salesman did *not* offer her "Planert skates as Johnson skates"; that she did not remember the exact price she paid for the Planert skates; that as she did not want the advertised stockings, the salesman said he "would make an allowance of one dollar on the skates"; and that she was satisfied with her purchase of the Planert skates.

As evidence of misrepresentation and unfair trade competition on the part of the Goldblatts, complainant's counsel here lay great stress upon that portion of the advertisement of December 16, 1927, wherein appear the words, "Another *Big Shipment* Received for Tomorrow." The evidence does not disclose that this was a misrepresentation. It appears that on December 9, 1927, Butler Bros. delivered to the Goldblatts 500 pairs of Johnson skates and also *100 pairs on December 15, 1927*. And complainant's witness, Edward A. Bass, testified: "I would call 50 pairs a fair sized order and 100 pairs *a big shipment.*"

The court further found in the decree that the Planert Co., or its representatives, "consented to this advertising and scheme." We do not think that the evidence supports the finding. It does not appear that the Planert Co., or any of its representatives, ever consented to the form or substance of any of the four advertisements, or to any "scheme." While consent was given, at the Goldblatts' request, to an advertising allowance of $100, the same was given on November 22, 1927, before any advertisements had been drafted or published by the Goldblatts.

After careful consideration of the allegations of complainant's bill, the evidence and the voluminous briefs of respective counsel, we are of the opinion that the court erred in entering the decree, awarding the perpetual injunction, as first above mentioned. We

think that the master was right in his ultimate finding that complainant ''has failed to prove'' the allegations of its bill. The gist of the bill is the malicious conspiracy of the Goldblatts with the Planert Co. to injure the trade and business of complainant. We do not think that such a conspiracy or any conspiracy has sufficiently been proven. And we do not think that the evidence is sufficient to support the perpetual injunction, as prayed for or as allowed, on the ground of unfair trade competition on the part of the defendants or any or either of them.

Accordingly, the decree of the superior court of January 22, 1931, is reversed and the cause is remanded with directions to dismiss the bill for want of equity.

*Reversed and remanded with directions.*

KERNER and SCANLAN, JJ., concur.