(No. 28063.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK L. NATHANSON, Plaintiff in Error.

*Opinion filed January 17, 1945—Rehearing denied March 15, 1945.*

WM. SCOTT STEWART, of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, and MELVIN S. REMBE, all of Chicago, of counsel,) for the People.

Mr. CHIEF JUSTICE FULTON delivered the opinion of the court:

Under an indictment charging the crime of conspiracy, the plaintiff in error was found guilty by a jury in the criminal court of Cook county and sentenced to the county jail for a term of one year and fined $2000.

The indictment consisted of two counts. Count one charged that the plaintiff in error, Gladys McCall, Nancy Rosenbush and one John Doe conspired with each other and with divers other persons whose names were unknown, and by means which were unknown to the grand jurors, to cause a large number of women to abort or miscarry when said women were, respectively, pregnant with child and when such respective abortions and miscarriages were not necessary for the preservation of life.

The second count, which was dismissed, alleged a conspiracy to cause one Betty Diamond to miscarry. Gladys McCall, receptionist in plaintiff in error's office, was tried jointly with the plaintiff in error and was acquitted by a directed verdict at the conclusion of all the evidence. Nancy Rosenbush, the nurse, and a so-called interne who administered an anesthetic and who was designated in the indictment as John Doe, were not apprehended.

After the imposition of sentence in the circuit court of Cook county, the plaintiff in error, Dr. Nathanson, brought the appeal to this court, claiming he had been deprived of certain constitutional rights. The cause was transferred to the Appellate Court upon our view that no *bona fide* constitutional questions were involved. *People* v. *Nathan-*

*son,* 382 Ill. 145. At the hearing in the trial court, Bernice Ceropski, one of the State's witnesses, testified that she was married, knew the plaintiff in error and visited him at his office in Chicago on November 24, 1941. She had a conversation with the doctor and told him that she was pregnant, having missed two of her menstrual periods, and that she suffered from nausea. In response to the doctor's question as to why she wanted to get rid of it, the witness stated that she didn't have sufficient money to keep it up; that her husband didn't have a good job; that she worked and was just able to get along and she had to do something about it and wanted to get rid of it. The doctor asked her how much money she had, whereupon she told him $35 and gave this sum to him. Thereafter, the nurse, Nancy Rosenbush, gave her an enema and prepared her for the operating table. She was shaved by the doctor and an anesthetic administered by the interne. In the operating room were a table and a variety of surgical instruments. When the witness came out from under the anesthetic, she was given an injection in the thigh by Dr. Nathanson. After being taken to another room, the nurse gave her some pills, for which she paid an additional $2. After leaving the doctor's office, she became ill and remained so the following day, whereupon she telephoned the plaintiff in error and complained about her condition. She again returned to the doctor's office, was given another enema by plaintiff in error and again anesthetized by the interne, after which another injection was given to her in the thigh. At approximately 11:00 o'clock on the night before the trial, the plaintiff in error called at her home and told her that he had given a lawyer, not of record in this case, $1500 to give to her and endeavored to persuade her not to prosecute him.

Muriel Jensen Minch testified that she was a graduate nurse and had had a conversation with Dr. Nathanson in

the presence of her husband on the morning of December 3, 1941, and told him that her last menstrual period had been six weeks prior to that date. She asked him what method he employed and whether he did a complete dilatation and curettage. The plaintiff in error told her that was his manner of procedure. She was thereupon prepared and assisted to the operating table by the nurse. The plaintiff in error shaved her in the pubic region and the interne administered the anesthetic. When she regained consciousness, she inquired whether it was all over and was advised by the interne that nothing was done; that "we got a call from the front." He told her to dress as quickly as possible, which she did, and she was then taken upstairs to an apartment through a corridor leading from a door out of the doctor's office where she saw the defendant, a Mrs. Walke, Miss Diamond and the nurse. The plaintiff in error informed all of them that if they would be quiet and stay there for a while, when the police left they would be able to go and would not be molested. Before leaving the apartment with Mrs. Walke, she told the plaintiff in error she would telephone him if the police had left and ten minutes after leaving the office she telephoned the doctor and advised him that the police were no longer there.

Betty Jane Diamond testified she went to the doctor's office with her father on December 3, 1941, where the plaintiff in error examined her privates with his hands. After the examination, her father asked the doctor if he could take care of her and Nathanson replied he would. Her father asked the doctor how much it would cost and told the doctor he had only $65 with him. The plaintiff in error wanted $100 but agreed to take care of her. Her father then left and she was taken by the nurse and given a gown to put on after removing all of her clothes. She was then placed on the operating table, shaved and given an anesthetic. Afterwards, she was dressed and taken up-

stairs to the apartment. There, she saw two girls leave the apartment and heard the interne tell them to call back after they left. When she left the building, she left by a different entrance than that which she used to enter the doctor's office.

Frank Diamond, the father of Betty Jane, corroborated the daughter's testimony. He testified that the doctor asked him for $100 but that he told him he had only $60; that the doctor said under the circumstances he would take care of the daughter; that the father thereupon left the office and returned about 2:00 o'clock in the afternoon and found the police present.

David Lichtenstein, a police officer, testified that he and Sgt. Mulhern procured a warrant and proceeded to plaintiff in error's office about noon on December 3, 1941. They were told by the receptionist to wait a moment. After waiting an hour, they forced their way into the office but found no one present. They searched the place and found an archway leading to another building and, upon going in there, they found the plaintiff in error and Miss McCall. The police officers took both of them to the Holy Cross hospital where Mrs. Ceropski was being treated by another physician following her treatment by Dr. Nathanson. The plaintiff in error was identified by Mrs. Ceropski in the presence of the officers.

Neither the plaintiff in error nor any witness in his behalf testified upon the trial and no evidence of any kind was adduced by him on the hearing to deny the testimony offered by the witnesses for the prosecution.

The Appellate Court for the First District affirmed the judgment of the trial court, holding that the jury would not have been justified in drawing from the undisputed evidence and the attending circumstances any fair inference that the plaintiff in error was innocent, and that Nathanson was given a fair and impartial trial, free from any prejudicial errors.

The plaintiff in error seeks to reverse the judgment against him on the ground that the State failed to prove the *corpus delicti,* it being necessary to prove the substantive offense in order to establish the conspiracy in the absence of direct proof; that more than one person must be guilty to sustain a conviction for conspiracy; that there was no proof that the abortions were not necessary for the preservation of life; that it was necessary to name the persons conspired against; that the indictment was insufficient; that the attorneys for the State prejudiced the plaintiff in error in their arguments before the jury and that prejudicial error occurred in the giving of instructions 2, 4, 5, 6 and 11 and the refusal of instructions 23 and 24.

The plaintiff in error places emphasis upon the case of *People* v. *Peyser,* 380 Ill. 404, to the effect that the People failed to prove the *corpus delicti.* That was a prosecution for abortion where it is necessary to prove pregnancy as a part of the *corpus delicti,* and is readily distinguishable from the case at bar.

With the contention of the plaintiff in error that more than one person must be guilty to sustain conviction for conspiracy, we have no quarrel. The evidence is quite sufficient to establish agreement and concert of action in operations which, in themselves, were for an illegal purpose. It is not necessary that the object of the conspiracy be accomplished. (*Ochs* v. *People,* 124 Ill. 399; *People* v. *Lloyd,* 304 Ill. 23.) If there was a common design, under these authorities, it would not be necessary to prove a condition existed which would enable the conspirators to commit an abortion. The gist of conspiracy is the illegal agreement, and it was for the jury to determine from the circumstances proved whether an agreement between plaintiff in error and unknown persons had been proved beyond a reasonable doubt. Here, in each instance, the proof showed that the witnesses were in good health and suffered from no other ailment or illness other than the missing of

their menstrual periods and nausea. Under the circumstances, we believe the proof sufficient to comply with the allegations of the indictment that such abortions, if completed, were unnecessary for the preservation of life.

Giving attention to the specific allegations of the indictment, we find same to be in all regards sufficient. The plaintiff in error concedes that a conspiracy may be established by circumstantial evidence but insists that the evidence fails to measure up to the rule which requires that the circumstantial evidence adduced to support a conviction must be such that the conclusion drawn therefrom excludes every reasonable hypothesis other than guilty, and that no conviction can be had where the evidence is as consistent with innocence as with guilt. This rule has been set forth as a correct statement of law in several cases cited by the plaintiff in error. (*Marzen* v. *People,* 173 Ill. 43, *Nestor Johnson Mfg. Co.* v. *Goldblatt,* 265 Ill. App. 188.) However, after giving consideration to all of the evidence, we feel that the jury would not have been justified in drawing any conclusion from the undisputed evidence and the attending circumstances other than that the plaintiff in error was guilty. He discussed with at least three witnesses the contemplated abortions and accepted money from two of them for operations to be performed to relieve them of their condition. He, together with the nurse and interne, knew that the operations to be performed were illegal and the jury was well within its rights to imply such a conclusion from the facts adduced at the trial. The circumstances surrounding the arrest of the plaintiff in error certainly are not consistent with his innocence. Had the plaintiff in error and his assistants been performing legal operations, there would have been no necessity for them to hide from the police nor to make efforts to hide their actions from official scrutiny. The very fact that they hid from the police and removed one of the witnesses from the operating table without ever completing the operation at

hand, indicates they had something to hide and their very conduct, unexplained, carries a fair implication of guilt. (*Barron* v. *People,* 73 Ill. 256.) Plaintiff in error's subsequent conduct in coming to the home of Mrs. Ceropski in an effort to persuade her not to prosecute him is likewise further evidence of the illegal conduct of the plaintiff in error and his assistants.

The charge in the indictment is that there was a conspiracy to commit the crime of abortion. Whether it was possible to commit such a crime, we believe is not pertinent to the issues. As was said in the case of *Ochs* v. *People,* 124 Ill. 399, "There might have been the conspiracy, and yet it not be carried out." It was there further said, "It is seldom proved expressly, nor can a case easily be imagined in which that is likely to occur, unless where one or more of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution. In nearly all cases, therefore, the conspiracy is proved by circumstantial evidence, namely, by proof of facts from which the jury may fairly imply it. It is usual to begin by showing that the defendants all knew each other, and that a certain degree of intimacy existed between them, so as to show that their conspiring is not improbable; and if to this can be added evidence of any consultations or private meetings between them, then there is a strong foundation for the evidence to be subsequently given, namely, of the overt acts of each of the defendants in furtherance of the common design. But although the proof above mentioned is desirable, because it satisfies the jury as you proceed, and they are better able to apply the evidence of the overt acts when it is afterwards given, yet it is not essentially necessary, as the jury may imply the conspiracy of all from the overt acts of each." Under the circumstances, it was not necessary that there be positive proof of the pregnancy of the witnesses.

It is further contended that prejudicial error occurred in the argument of the State to the jury and in the giving of instructions 2, 4, 5, 6, 11 and the refusal of instructions 23 and 24. The plaintiff in error concedes that instructions 2, 4, 5 and 6 have heretofore been approved by this court but insists they are misleading in the present case. He charges that instruction No. 4 assumes that an unlawful conspiracy existed and that an instruction should not assume a disputed fact. We do not find that the instruction contained any such assumption. Nor do we find that any one of said instructions is misleading in this case. Instruction No. 11 was also a proper instruction in the present case. Plaintiff in error's instruction No 23 was properly refused as not defining the law applicable to the facts in the case and the substance contained therein is covered by other instructions given to the jury. Instruction No. 24 was a cautionary accomplice instruction which, under the circumstances, could well have been given. However, failure to give this instruction was not such an error as to cause prejudice to the plaintiff in error's case. An examination of the record leads us to the conclusion that the plaintiff in error was given a fair and impartial trial, free from any prejudicial errors. Although some of the statements made by the prosecution to the jury could well have been omitted, we find in them nothing prejudicial to the cause of the defense. The evidence was such that the jury could not have drawn any other conclusion from the facts but that the plaintiff in error was guilty as charged in the indictment.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*