(No. 43201.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MONTY POWELL, Appellant.

*Opinion filed January 26, 1973.*

KENNETH L. GILLIS and JACK P. RIMLAND, both of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE, JOHN O'ROURKE and NICHOLAS D. TAUBERT, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Defendant, Monty Powell, was indicted for the attempted armed robbery and murder of an East Chicago Heights Police Department dispatcher, Oscar Brumfield. At his first trial in the circuit court of Cook County, the jury was unable to reach a verdict. Following a subsequent jury trial, he was convicted of both charges and judgments were entered. Upon the jury's recommendation he was sentenced to death for the murder and now appeals to this court (50 Ill. 2d R. 603) contending that various errors, hereinafter enumerated, denied him a fair trial and that his sentence was improper.

John Gallano of the sheriff's police testified that on March 9, 1969, at about 1:50 A.M., he went to the East Chicago Heights police station in response to a call and discovered deceased lying in the station corridor. A pistol, apparently owned by deceased, was found under several books which had fallen from an overturned carton. A coroner's pathologist stated that death was caused from a bullet wound in the heart.

At the time of the shooting Donald Wright was incarcerated at the station. He testified that he was awakened by a gunshot but from his cell could not see what occurred. He estimated that the police arrived fifteen minutes after the shooting.

Two police dispatchers testified that they knew defendant, who was the admitted leader in that area of an organization known as the Blackstone Rangers. They claimed that on several prior occasions defendant had asked them about weapons which were kept at the police station.

The State produced several members of this group as its witnesses. Johnell Perry testified that in the early evening of March 8, 1969, he was with Charles Smith and others when East Chicago Heights police seized a gun from Smith. Later that evening he and others were at the home of Jerome Branch, and when the defendant arrived there was a discussion regarding the loss of the gun. Defendant said that he had to have it back. Further discussion followed regarding the recovery of the gun, and the number of people that could be expected at the police station at that hour was contemplated. Defendant selected four others to accompany him to the station. They obtained disguises and left. Upon their return a short time later defendant had a gun in his hand and, when asked what had happened, said he had to shoot the man because he pulled a gun on him.

Eugene Perry corroborated the testimony of his brother Johnell. Andre Hood testified that the defendant was the chief of the Blackstone Rangers in East Chicago Heights. Hood was at the home of Jerome Branch when the loss of the gun was discussed. Defendant then talked about knowing where they could obtain many guns —"at the police station." Defendant, after requesting disguises, selected the persons who were to go with him. Upon their return a short time later, defendant was holding a gun, and when someone asked him what happened, he said that the old man went for his gun.

Joseph Harris was the only occurrence witness to testify to the events which took place at the police station. He stated that upon his arrival at Branch's house that evening everyone was "hollering" about the gun which had been seized by the police. During their conversation defendant said that he knew where other guns could be obtained. After procuring disguises, Harris testified that he, defendant and three others departed for the station in a car which Harris had previously stolen. They drove about the area to ascertain whether there were any police patrols. Further reconnaisance indicated that the dispatcher was alone in the station. Harris then stated that he remained in the car while Charles Smith, who was unarmed, entered the station. He was followed by another member who was armed. Harris further testified that defendant, who was carrying a gun, then entered and immediately a shot was fired but Harris did not see who fired it. The three ran from the station to the car and they all returned to Branch's house where defendant made a statement that he shot deceased. Defendant and several others then went to a restaurant.

Harris also testified that in the early evening of March 12, 1969, prior to his departure for Tennessee, he was again at Branch's house. There, he said, defendant gave him a gun and told him to keep it until "things blow over."

Harris was arrested in Tennessee for an unrelated charge. The gun was found concealed in his car and was identified by a ballistic comparison as the murder weapon. He was then returned to Illinois and detained in the Cook County jail.

On cross-examination Harris denied that he and one Ronald Johnson had killed deceased. It was established, however, that certain promises had been made by the State to Harris in return for his testimony. Harris claimed that shortly before defendant's first trial (July, 1969) the State promised to recommend a sentence of 5 to 10 years for charges which arose against him from the shooting as well

as for the charge of stealing the automobile which was used in connection with the killing. The State also promised to contact the Tennessee authorities concerning the charges pending against him there. Harris refused this offer and another offer of 3 to 7 years. Finally, he agreed to testify when he was offered a recommendation of a 1-to-3-year sentence. He admitted that he knew one Thomas Johnson and Theotis Clark, who were in the county jail with him at about the time of these offers, but denied telling them about the "deal" which was promised in return for his testimony.

On redirect examination, Harris, over defense objection, testified that his statement given to the police upon his return from Tennessee in March, 1969, was substantially the same as his testimony given at trial.

Ronald Johnson, another member, in substance corroborated the testimony of Harris and other witnesses concerning the events at Jerome Branch's house on the evening of the murder. He also testified that as he was leaving the house to go to the restaurant he asked defendant what had occurred. Defendant responded that when he approached the door of the police station, Brumfield, apparently observing that one of the intruders was wearing a scarf over his face, reached for his weapon and defendant said he shot him. Johnson further stated that he was at Branch's house on March 12, 1969, and saw defendant give Harris the murder weapon, but he said that Harris gave it back to the defendant. Johnson testified that he left shortly thereafter.

Matt Simpson, the restaurant owner, testified that defendant, Joseph Harris and several others entered his restaurant at 2:00 A.M. on the morning of the murder. They departed after purchasing some food.

Defendant testified in his own behalf and denied any involvement in the crime. He claimed he was home that evening with his younger brother and sisters and remained there when his mother came home at midnight. He said

that he then went to the restaurant alone arriving there at 1:30 A.M.

An alibi witness was called in an effort to refute the circumstances surrounding the transfer of the weapon on March 12, 1969. Reverend Frank McCall, a community worker in East Chicago Heights, testified that he arrived at defendant's house in the early evening hours of that day. He met defendant and both went to a meeting. He stated that after the meeting he took defendant home where they continued to talk until about 9:00 P.M.

Thomas Johnson, called by defendant, testified that he was in the Cook County jail in July, 1969, where he met Joseph Harris. The State objected to the admission of any conversations this witness had with Harris. It was the State's position that the defense had not established a sufficient foundation for impeachment because it failed to inquire on cross-examination of Harris if he had admitted to Johnson that he had killed the dispatcher.

Defense counsel, out of the jury's presence, conceded that through his inadvertence a proper foundation was not established but sought to cure this defect by having Harris recalled. The trial court denied this request but did instruct defense counsel that he might inquire if Harris had told Johnson that he (Harris) had killed deceased.

An offer of proof based upon Thomas Johnson's testimony at the prior trial was then made. Defense counsel asserted that this witness would testify that he had talked to Harris in early July, 1969, in the county jail; that Harris said he killed deceased and defendant was not involved; that Harris informed him of the prosecution's pressure to testify against defendant and he did not know what to do; that Johnson then said to "be cool" and went to get Theotis Clark, another inmate; that after he returned with Clark, Harris told them that he and Ronald Johnson went to the station to steal guns in order that he might obtain recognition from the leaders of the Blackstone Rangers; that he stayed in town for several days after

the shooting and then went to Tennessee where he was arrested and the murder weapon was discovered in his car; that if he testified, he could obtain a lenient sentence because of his past mental history; and that he had been offered one year incarceration and three years probation in return for his testimony.

After this offer of proof was made, Thomas Johnson then testified that Harris told him and Theotis Clark, another member of the Blackstone Rangers, that he (Harris) and Ronald Johnson had shot deceased. Harris was called in rebuttal and denied having made this statement.

Defendant argues that the trial court erred in limiting the testimony of Thomas Johnson. Citing *People v. Lettrich, 413 Ill. 172,* he contends that the jury should have been allowed to hear all of the testimony concerning Joseph Harris's alleged out-of-court statement and evaluate it presumably as substantive evidence. In *Lettrich* defendant was convicted solely on the basis of his confession, which was given under questionable circumstances. The defense sought to call the director of the behavior clinic, who witnessed a confession to the crime made by an unavailable third party. There the court held that the director's testimony was admissible.

In the present case the facts are not comparable to *Lettrich* and that decision is inapplicable. (See *People v. Hairston, 46 Ill.2d 348, 373-74.*) Moreover, we have recently rejected the argument which would allow the introduction of a witness's prior out-of-court statement as substantive evidence (*People v. Collins, 49 Ill.2d 179*), and defendant has failed to advance any compelling reason requiring reconsideration of that decision.

Alternatively defendant maintains that Thomas Johnson should have been allowed to testify to those matters contained in the offer of proof for purposes of impeaching Harris's testimony by proof of his prior inconsistent statements. Defendant, relying upon *People v. Henry, 47 Ill.2d 312,* contends that a sufficient foundation was

established during cross-examination of Harris to enable Thomas Johnson to testify as to matters contained in this alleged conversation. He argues that although the trial court did permit this witness to testify as to statements in which Harris purportedly said that he and Ronald Johnson killed the dispatcher, it was error to prohibit him from relating other portions of the conversation. He asserts that the exclusion of details concerning Harris's motive, his flight, the method of concealment of the murder weapon and his statement of defendant's innocence deprived the jury of crucial considerations upon which it might fully evaluate this impeaching testimony. Moreover, defendant contends that the trial court abused its discretion in refusing to allow Harris to be recalled in order to "perfect the foundation." We do not agree.

Before prior inconsistent statements are offered for impeachment purposes, a foundation must be laid when the witness, whose credibility is challenged, is cross-examined. (*People v. Perri, 381 Ill. 244.*) This rule is designed to protect the witness from unfair surprise and assure him the opportunity to deny or to explain the prior statement. *People v. Rodgers, 53 Ill.2d 207.*

In *Henry* (47 Ill.2d 312, 322) we recognized that in certain situations the conventional method of establishing an adequate foundation for the introduction of prior inconsistent statements need not be rigidly applied where the reasons for this rule are substantially satisfied. There the witness, whom the defendant sought to impeach, denied and then later claimed that she did not remember having a conversation with her aunt or others concerning her police statement. Witnesses were then called who would testify that such conversation did occur in which this witness told them that she gave the statement only after she had been allegedly coerced by the police. The trial court sustained objections to the introduction of this testimony. It was clear that under the circumstances of *Henry* the reasons for the foundation rule were fulfilled

because the witness had been afforded the opportunity to explain the alleged conversation but her responses to the threshold questions made further inquiry into the matter a futile exercise.

The present case, however, is factually distinguishable because the record discloses that although Harris was subjected to extensive cross-examination, defense counsel never inquired if Harris had told Thomas Johnson that he killed the dispatcher. Harris was not afforded the opportunity to explain or deny the substance or existence of this alleged conversation. While the trial court expressed some doubt as to the "inadvertence" of defense counsel to establish a proper foundation inasmuch as he possessed a transcript of defendant's prior trial, he was permitted, unlike in *Henry,* to elicit the critical portion of the alleged conversation that Harris and Ronald Johnson were the murderers and by implication that defendant was not involved. An examination of the remainder of the offer of proof does not disclose statements which were significantly inconsistent with Harris's testimony.

Nor do we believe that the trial court abused its discretion in refusing to recall Harris. The introduction of prior inconsistent statements is designed to challenge the credibility of a witness. (*People v. Moses, 11 Ill.2d 84, 87.*) As heretofore discussed the crucial part of Harris's alleged statement was presented to the jury and it was completely informed of the "deal" he had made in return for his testimony. The jury was therefore apprised of adequate information necessary to determine his credibility.

Defendant next contends that reversible error was committed when Joseph Harris was permitted to testify that he had given a statement on March 20, 1969, prior to his being indicted, that was substantially identical to his present testimony (January 26, 1970). As stated in *Waller v. People, 209 Ill. 284, 287,* "proof of statements made by a witness out of court harmonizing with his testimony is inadmissible, but where it is charged that his story is a

recent fabrication, or that he has some motive for testifying falsely, proof that he gave a similar account of the transaction when the motive did not exist or before the effect of the account could be foreseen is admissible." (See also *People v. Clark, 52 Ill.2d 374, 389; Gates v. People, 14 Ill. 433;* 4 Wigmore, Evidence, sec. 1128 (3d ed. 1940).) Here, defense counsel had attempted to detract from Harris's credibility on cross-examination by establishing that he had a motive to testify falsely because of the "deal" which he had made in July, 1969. Harris claimed that this prior statement was given at a time when no offer of leniency had been made and thus prior to his ability to foresee any benefit which he might obtain in return for his cooperation. The trial court did not err in allowing this testimony.

Similarly, we find no merit in defendant's contention that the State's reference to this matter in closing argument was improper. The comments of which he complains were based upon the record. *People v. Tillman, 26 Ill.2d 552, 555.*

He next urges error when the trial court, outside the jury's presence, instructed the State to inform the jury in its final closing argument that the court was not involved in the "deal" with Joseph Harris. This action was apparently prompted because the trial court believed that both the State and defense had unintentionally implied during the course of the proceedings that it was bound by any recommendation as to the sentence to be imposed for the charges pending against Harris. Thereafter the assistant State's Attorney informed the jury that Joseph Harris would be sentenced by the trial court and that it was not bound by a prosecution recommendation as to the sentence. Defendant now maintains that the jury was completely misled as to the infirmity inherent in Harris's testimony by this comment, for the jury might believe that the agreement between Harris and the State did not exist.

The trial court was seeking to protect its integrity by

directing the State to dispel any belief that it was bound by an agreement. We do not believe that it exhibited partiality toward the State in requiring this explanation nor that the comment itself misled the jury as to the existence of the agreement between the State and Harris, thereby prejudicing defendant.

It is also contended that two other portions of the State's closing arguments were improper. Defendant refers to the following statement: "There is no one in this courtroom, no one in this courtroom, who would ask you or who would permit you to find an innocent man guilty. But, do not send a murderer back out. Don't send a killer of a police officer back out on the street. Give both sides a fair verdict. This is all we are asking you to do, and that is what we are asking you to do now." No objection was made and from a review of the entire record we do not believe that any plausible interpretation of this comment may be construed as seriously prejudicial. Thus defendant has waived his right to further consideration of this matter. *People v. George, 49 Ill.2d 372.*

He also complains that prejudice was created by the State's remark that "He doesn't think you'll do it. He doesn't think you'll give him the chair." When considered in its context, the statement was made in that portion of the argument urging that the jury recommend the death penalty. Prior to this the State had cautioned the jury that it should first consider if defendant was proved guilty beyond a reasonable doubt and only after this had been determined should the jury address itself to the appropriate penalty. It is evident that the aforementioned comment was therefore directed only to the sentence which might be imposed. As hereinafter discussed, the death penalty is improper, rendering additional discussion of this matter unnecessary. Similarly, his contention challenging the impropriety of a question directed to prospective jurors concerning their beliefs as to the death penalty need not be considered.

Defendant also maintains that he was not tried by a fair and impartial jury of his peers. He does not challenge the method initially utilized to summon those eligible for jury service (Ill. Rev. Stat. 1969, ch. 78, par 1 *et seq.*) but attacks the validity of the group from which the petit jury was selected on the basis that it did not represent a fair cross-section of the population, particularly a proportional number of Negro citizens.

Defendant filed a motion seeking to discharge the venire pursuant to law. (Ill. Rev. Stat. 1969, ch. 38, par. 114—3.) Various exhibits were included in his motion. These exhibits contained lists of names and addresses of those called for duty on nine prior venires. Census tracts, which broadly described the racial composition of various locales, were also presented. By correlating the addresses of the prospective jurors with the racial composition of the areas in which they lived, defendant endeavored to establish a pattern and frequency of Negro juror participation in Cook County. The trial court denied the motion.

Defendant concedes that from the limited sample of the nine prior venires he could not identify those prospective jurors specifically according to race. The census data was taken from the 1960 United States census and a 1966 estimate compiled by a private research group. It is evident that any conclusion to be drawn from these exhibits would therefore be subject to statistical error.

Moreover, "a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. [Citations.] Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." (*Swain v. Alabama, 380 U.S. 202, 208, 13 L. Ed. 2d 759, 766, 85 S. Ct. 824.*) However, a deliberate attempt by the State to exclude Negroes from jury participation because of race is impermissible (*Swain*), and it is incumbent upon

the defendant to establish a *prima facie* case of purposeful exclusion. *Whitus v. Georgia, 385 U.S. 545, 550-551, 17 L. Ed. 2d 599, 603-604, 87 S. Ct. 643.*

At a hearing on defendant's motion, the jury supervisor testified that no record was made of the racial heritage of prospective jurors. He further stated that he did not determine who was summoned for jury duty. When the prospective jurors arrived, they were assigned numbers and corresponding numbers were placed in a barrel and randomly selected until a venire was composed. No discrimination can be found in this procedure.

In addition, defense counsel stated that five prospective Negro jurors had been dismissed on peremptory challenges of either the State or defense. The record further reveals that one Negro was selected for the petit jury. We conclude that defendant has failed to establish a *prima facie* case of purposeful discrimination in the jury selection procedure.

It is also argued that the trial court erred in failing to give an instruction dealing with the subject of accomplice testimony which he now claims deprived him of a fair trial under the facts presented. The request was made after closing arguments but prior to the trial court instructing the jury. Defense counsel informed the court that he had neglected to prepare this written instruction (presumably I.P.I. Criminal No. 3.17). However, he suggested that an oral instruction would be satisfactory, but the State argued that the instructions had been tendered in the usual manner. The trial court then refused to give an instruction in either form noting that defense counsel had been afforded ample opportunity to submit proposed instructions.

There are various procedural defects evident in defendant's request which we need not consider. Aside from the incriminating testimony of Joseph Harris, three witnesses testified that defendant admitted the shooting shortly after its occurrence. Another witness testified that

he heard defendant state that the deceased tried to obtain a weapon. After review of the record we believe that defendant's guilt was established beyond reasonable doubt. Moreover, the trial court instructed the jury that it should consider a witness's bias, motive or prejudice in determining his credibility, a factor which was strongly emphasized by the defense in closing argument relative to Harris's testimony. Under these circumstances we do not believe that defendant was prejudiced by the trial court's refusal. See *People v. Nathanson, 389 Ill. 311, cert. denied, 325 U.S. 872.*

Defendant finally raises several contentions pertaining to the validity of his sentence. Recent decisions, however, preclude imposition of the death penalty in this case. (*Moore v. Illinois, 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562;* see also *People v. Speck, 52 Ill.2d 284; People v. Steel, 52 Ill.2d 442.*) Having found no reversible error, we affirm the conviction but remand this cause to the circuit court of Cook County with directions to sentence defendant to a penalty other than death. In this regard we further hold that upon remand the court may properly consider defendant's prior juvenile record, as was previously done, in the aggravation and mitigation hearing. Ill. Rev. Stat. 1971, ch. 37, par. 702—9(2).

*Affirmed and remanded.*